# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BUCKEYE PARTNERS, L.P., and BUCKEYE PT TERMINALS LP, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0255-JTL |
| GT USA WILMINGTON, LLC, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: February 2, 2022
Date Decided: March 29, 2022

Jody C. Barillare, Amy M. Dudash, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; Michael D. Blanchard, MORGAN, LEWIS & BOCKIUS LLP, Hartford, Connecticut; Julie S. Goldemberg, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania; Leslie B. Spoltore, OBERMAYER REBMANN MAXWELL & HIPPEL LLP, Wilmington, Delaware; Nicholas Poduslenko, Matthew S. Olesh, OBERMAYER REBMANN MAXWELL & HIPPEL LLP, Philadelphia, Pennsylvania; *Attorneys for Plaintiffs*.

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Thomas J. Elliott, Frederick P. Santarelli, Jack P. Elliott, Colin J. O'Boyle, ELLIOTT GREENLEAF, P.C., Blue Bell, Pennsylvania; *Attorneys for Defendant*.

**LASTER, V.C.**

Defendant GT USA Wilmington, LLC ("GT") operates the marine terminal located at the Port of Wilmington (the "Port" or the "Terminal"). Plaintiff Buckeye PT Terminals LP (the "Company") leases a dock in the Terminal that it uses to operate a terminalling business involving the transportation and storage of liquid petroleum products.

In its role as marine terminal operator, GT has the authority to publish a tariff that establishes rates that users of the Terminal must pay for specified activities or services. As a user of the Terminal, the Company is subject to the tariff. The rates in the tariff only apply if GT and the user of the Terminal do not have a specific agreement addressing the activity or service in question.

In 2018 and 2020, GT issued tariffs that imposed "Terminal Usage Fees" on stevedores or parties engaged in stevedoring. The Company refused to pay the Terminal Usage Fees, contending that it was neither a stevedore nor engaged in stevedoring. The Company also maintained that the rent it paid under the lease provided bargained-for consideration for the activities involved in operating the terminalling business. The Company argued that GT could not impose additional and duplicative fees for the same activities that the Company had always engaged in under the lease.

After attempts at settlement failed, GT tried to force the Company to pay the Terminal Usage Fees by interfering with the Company's business. The Company's terminalling operation is relatively simple. When a vessel carrying liquid petroleum product arrives at the dock, a Company employee helps connect a hose that runs from the vessel to a manifold. The manifold connects to pipes that run under the Terminal and connect to fuel storage tanks located on a property owned by the Company and adjacent to

the Terminal (the "Tanks"). The vessel uses its pump to send the liquid petroleum product through the hose, into the manifold, through the pipes, and into the Tanks. The Company's customers send tanker trucks to pick up the liquid petroleum product at the Tanks. To get to and from the Tanks, the trucks drive through the Terminal using Sico Road and Hausel Road (collectively, the "Disputed Roads").

To force the Company to pay the Terminal Usage Fees, GT prevented the Company and its customers from using the Disputed Roads. The blockade threatened to destroy the Company's business, and the court enjoined GT from blocking the Company's access during the pendency of this litigation.

This post-trial decision addresses two issues. The first is whether the Company owes the Terminal Usage Fees. The second is whether GT can prevent the Company and its customers from using the Disputed Roads. The Company wins on both points.

On the first issue, the Company proved that it does not owe the Terminal Usage Fees because it was neither a stevedore nor engaged in stevedoring. The definition in the 2018 tariff plainly did not apply to the Company. The 2020 tariff redefined the term, but the new definition was ambiguous. GT was the sole drafter of the tariff, and the doctrine of *contra proferentem* calls for reading any ambiguity against GT. The Company also established that the rent it paid under the lease already provided compensation to GT for the Company's right to use the services and engage in the activities necessary to conduct its terminalling business. Because the lease already encompassed those services and activities, the lease constituted a specific agreement that precluded the imposition of the Terminal Usage Fees for those same services and activities. GT did not provide any

2

additional services in exchange for the Terminal Usage Fees, and the Company was not engaging in any new or different activities that might have warranted charging the Terminal Usage Fees.

On the second issue, the Company proved that the lease includes an implied contractual right for the Company and its customers to use the Disputed Roads to access the Tanks in connection with the Company's terminalling business. The Company presented additional theories grounded in property law which, if proven, would have provided the Company a more durable and expansive right of access. The Company introduced some evidence in support of its property-based theories, but it failed to carry its burden of proving them.

## I. FACTUAL BACKGROUND

Trial took place over three days. The parties introduced 354 exhibits, including the deposition transcripts of seven individuals. Four fact witnesses and four experts testified live.[1]

---

[1] In the pre-trial order, the parties only agreed to twenty-five stipulations of fact. This decision relies on them when applicable. Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 199. Citations in the form "[Last Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Last Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number or, if the document lacked a control or JX number, by the internal page number. If a trial exhibit used paragraph numbers, then references are by paragraph. Citations in the form "[Last Name] Dem." refer to demonstratives used by experts at trial.

The facts set forth in this decision were proven by a preponderance of the evidence. The Company's attempt to prove it had an easement required a showing of clear and convincing evidence, and the Company failed to meet that standard.[2]

## A. The Company And Its Terminalling Business

Buckeye Partners, L.P. ("Buckeye Parent") provides logistics services for liquid petroleum products across the United States and the Caribbean. The Company is a wholly owned subsidiary of Buckeye Parent.[3]

For decades, the Company or its predecessors have engaged in essentially the same business. The Company receives liquid petroleum product from a vessel at the dock. The vessel uses its pump to cause the liquid petroleum product to flow through a hose and into

---

[2] *See K&G Concord, LLC v. Charcap, LLC*, 2017 WL 3268183, at *6 (Del. Ch. Aug. 1, 2017) (requiring clear and convincing evidence to establish an easement by prescription and an easement by estoppel); 25 Am. Jur. 2d *Easements & Licenses* § 14, Westlaw (database updated Feb. 2022) ("An express grant of an easement must be in writing, and the grantor's intent to create an easement burdening particular property for the benefit of another must be clearly and unmistakably communicated."); *Easements & Licenses*, *supra*, § 100 ("In general, a party claiming an easement has the burden of proof, and an easement generally must be established by clear and convincing evidence." (footnotes omitted)); 3 Tiffany Real Property § 803 (3d ed.), Westlaw (database updated Sept. 2021) ("Although a plaintiff in a civil action normally must meet his burden by only a preponderance of the evidence, the plaintiff must overcome a higher clear and convincing standard to prove an easement.").

[3] Both the Company and Buckeye Parent are plaintiffs, but it is not clear why Buckeye Parent is a party to the case. The Company is a signatory to the relevant agreements, and the Company appears to be the holder of all the rights that the plaintiffs claim to have. The declarations that this decision awards run in favor of the Company. Buckeye Parent will benefit from those declarations as the sole owner of the Company, but it does not hold any of the rights that this decision recognizes.

4

a manifold under the dock. The manifold connects to pipes that run underneath the Terminal for approximately one mile, eventually reaching the Tanks. The Company stores the liquid petroleum product in the Tanks until its customers retrieve it using tanker trucks. The Company's customers use the Disputed Roads to travel to and from the Tanks.

The following picture depicts the geography of the dock, the Disputed Roads (Hausel Road and Sico Road), and the Tanks.



Hoffman Dem. 39 ("Dock" label and arrow added). As the photo makes clear, the Company's terminalling business depends on using the Disputed Roads to access the Tanks.

The Company has operated its terminalling business in the same manner since at least 2008, when the Company entered into the lease at issue in this case. *See* JX 120 (the "Lease"). A recital in the Lease refers to a pre-existing lease agreement dating back to

1973. *Id.* at '757. The evidence indicates that similar terminalling businesses have operated at the Port for nearly a century.

## 1. SICO Establishes The Original Terminalling Business.

The Port opened in 1923. JX 67 at '117. Just three years later, in 1926, the Schock Independent Oil Company ("SICO") took steps to establish a terminalling business by entering into a lease with the City of Wilmington. *See* JX 78 at 1. Through the lease, SICO secured the property rights necessary to "construct piers and bulkheads along the Delaware River adjoining the Marine Terminal." *Id.* In a resolution approving the lease, the Wilmington City Council acknowledged that it would give SICO "access to their recently purchased site of 23 acres where they will erect a plant . . . for th[e] importation and distribution of petroleum products." *Id.*[4]

Clarence Schock, the President of SICO, stated at the time that "[w]ith our import plant in Wilmington we will be enabled to receive vessels from American or foreign ports, discharge and store in Wilmington and distribute to our wholesale stations." JX 78 at 2. He thus envisioned a terminalling business comparable to what the Company conducts today.

The parties call the original twenty-three acres of land "Buckeye Parcel # 1." By 1927, SICO had constructed oil storage tanks with a storage capacity of 11,200,000 gallons

---

[4] Technically, Crane Hook Oil Storage Company, a wholly owned subsidiary of SICO, acquired Buckeye Parcel # 1. In 1943, Crane Hook conveyed the parcel to SICO. *See* JX 238 ("Hoffman Report") ¶ 27; JX 102. In 1955, SICO changed its name to the SICO Foundation. JX 113 at '677. In 2003, the SICO Foundation changed its name to the Clarence Schock Foundation. JX 42 at '174.

on Buckeye Parcel # 1. Pictures from the 1930s depict trucks pulling up to SICO's tanks. JX 64 at 10; JX 121.

In 1951, SICO purchased additional land to accommodate its growing terminalling business. Hoffman Report ¶ 57. The parties refer to this as Buckeye Parcel # 2.

The Tanks sit on a combined parcel consisting of Buckeye Parcel #1 and Buckeye Parcel #2 (together, the "Buckeye Properties"). *See* Hoffman Dem. 24; JX 98. As noted, the use of Buckeye Parcel #1 for a terminalling business involving access to petroleum storage tanks dates back to at least 1927.

There is no evidence indicating that anyone ever restricted SICO and its customers from accessing the combined parcel. Frank Eichler, a former president of SICO, informed the Company's expert that during his tenure at the Company, which began in the 1950s, SICO and its customers had "unrestricted access." Hoffman Tr. 168; *see* Hoffman Dem. 27.

**2. The Delaware Terminal Company Continues The Terminalling Business.**

In 1973, the Delaware Terminal Company began conducting a terminalling business, initially as a joint venture with SICO. As part of that effort, the Delaware Terminal Company leased land from SICO to be used for "any lawful purpose, including specifically the construction, operation and maintenance of terminal[l]ing and storage facilities for petroleum and petroleum products." JX 118 § 7(A), at 13–14; *see* Hoffman Tr. 168–69.

7

In conjunction with the lease, an affiliate of Delaware Terminal named Energy Transporters, Inc. negotiated an agreement with the City of Wilmington that granted Energy Transporters

> the right to construct and maintain, at the sole cost and expense of [Energy Transporters], a pipeline for the transportation of oil, residual oil, petroleum and petroleum products in the bed of the Christiania Avenue from the Marine Terminal to a site to be designated by [Energy Transporters] on Commerce Street, in the rights-of-way of City on Cherry Island for Fourth Street and Twelfth Street, and across lands owned by City adjacent to the Sico property near the Marine Terminal.

JX 53 at '601. A 1975 agreement with the City of Wilmington permitted Delaware Terminal and SICO as a "joint partnership" to build a sewer line under Sico Road that could be connected to pipelines under the Tanks. JX 137 at '996–97. In 1987, Delaware Terminal merged with Energy Transporters. Hoffman Tr. 172.

There is no evidence indicating that anyone ever restricted Delaware Terminal and its customers from accessing the combined parcel.

### 3.    Diamond State Acquires The Terminal.

The next significant event for this case took place in 1995, when Diamond State Port Corporation ("Diamond State") purchased the Terminal from the City of Wilmington. Hoffman Tr. 173; JX 67 at '119. The Department of State of the State of Delaware formed Diamond State for the purpose of owning and operating the Terminal. JX 67 at '119. Although the owner of the Terminal changed, the terminalling business remained the same. *See* Klees Tr. 86–87.

After Diamond State acquired the Terminal, there were two changes to the ability of the Company and its customers to access the Tanks. The first took place in 1999, when

8

Diamond State constructed a gate at the Terminal's entrance. *See* JX 239, Ex. E. A gate continues to exist at the entrance today.

The second occurred in 2007, when the Terminal began requiring that users have a Transportation Worker Identification Credential to access the Terminal. Hoffman Report ¶ 44. That policy remains in effect today. A guard checks every individual before entering the Terminal, and if a user does not have the credential, then someone with a credential must accompany the user. *Id.* All of the Company's employees who work at the Terminal and many of its customers have credentials. *See* Ingalls Tr. 25–26; Klees Tr. 111.

### 4. The Company Takes Over The Terminalling Business.

In 2005, the Company acquired the Buckeye Properties from SICO, including the Tanks. JX 42. The Company also acquired other rights from SICO and Diamond State, including the right to use the dock under an existing lease and various easements granted by the City of Wilmington. *See* Hoffman Tr. 175; Lease at '754; JX 286 at '494. The Company began operating the terminalling business.

In 2008, the Company entered into the Lease with Diamond State for "[a]pproximatley 1,160 linear feet of dock space." Lease at '754. The Lease's initial term was for approximately three years and four months, with the Company having the option to extend the Lease up to eight times, each time for a period of five years. *Id.* § 3. Thus, the Lease could remain in effect for over forty-three years—until 2051. The Lease remains in effect today.

The stated purpose of the Lease is for "operating certain docking facilities for the transportation and storage of oil, petroleum products, hydrocarbons and their derivatives

9

and for the installation and operation of a mooring dolphin with catwalks and utilities." *Id.* at '754; *see id.* § 7(b) ("The Premises may be used and occupied for the purpose of operating certain docking facilities for the purpose of transportation and storage of oil, petroleum products, hydrocarbons and their derivatives . . . ."). To facilitate its stated purpose, the Lease granted the Company

> full rights of access for ingress and egress to the dock, walkway, and if available, reasonable parking space at the dock, and ingress and egress over existing roads owned or controlled by Landlord for access to the dock (collectively the "Premises") and as depicted on the drawing marked as **Exhibit "A"** attached hereto and made a part hereof.

*Id.* § 2.

The Lease also granted the Company "an easement with rights and privileges for all existing and planned dock lines and the existing Conectiv pipeline" and an easement to "facilitate Tenant's dock lines and the Conectiv pipeline," which the Lease defined collectively as the "Tenant's Easements." *Id.* The Lease contemplated that additional easements may be requested and granted:

> To the extent that easements in addition to those comprising Tenant's Easement[s] are necessary or desirable for the performance of Tenant's business, Tenant shall request that Landlord grant such easements or negotiate with the party by whom the easements must be granted. Any such easements are subject to the reasonable approval of Landlord.

*Id.* § 9.

Towards the end of long and difficult negotiations over the Lease, the Company asked for an "exclusive easement for Tenant and Tenant's customers providing vehicular and truck access to Tenant's Wilmington Terminal to facilitate receipt and delivery of

10

petroleum products." JX 305 at lines 161–63. The "exclusive easement" would have given the Company exclusive use of Sico Road to access the Tanks. *See* Bailey Tr. 666–67.

Parul Shukla, Diamond State's Chief Financial Officer, rejected the request for an exclusive easement. He summarized Diamond State's position in a contemporaneous markup of the Lease: "No: we have neither discussed exclusivity of the easement nor access." JX 305 at 37. The request for an exclusive easement was a non-starter for Diamond State because, as a matter of general practice, Diamond State would not give any user an exclusive easement. Bailey Tr. 666. Granting an exclusive easement would "restrict the ability of other tenants to get their cargo from the facility," which was contrary to Diamond State's aim of giving all Port tenants the ability to access Port roads. Bailey Tr. 652; *see also id.* at 678–79.

The Lease also established the Company's rent. Section Five of the Lease contemplated a fixed base rent, a volume-based fee, and the potential for additional rent. Lease § 5. The volume-based fee was determined by "the total number of barrels of oil, petroleum products, hydrocarbons and their derivatives crossing the dock entering into the Premises plus the total number of barrels of oil crossing the dock exiting from the Premises annually." *Id.* § 5(c) (the "Volume-Based Fee"). The amount charged would increase if and when the Lease was renewed for additional terms.

The Lease recognized that additional payments could be due under the Terminal's tariff for activities and services not covered by the Lease. The relevant section stated:

> Except as otherwise provided herein, all terms and conditions of the Port of Wilmington, Delaware Terminal Tariff FMC No. 21 publishing Rules and Regulations and Rates and Charges at the Port of Wilmington, Delaware

11

issued by the Diamond State Port Corporation, as amended from time to time, will apply to this Lease.

*Id.* § 27(e).

**B.      GT Takes Over The Terminal.**

In 2018, GT obtained the right to operate the Terminal under a concession agreement with Diamond State. JX 32 (the "Concession Agreement" or "Con. Agr."). GT agreed to "faithfully obey and comply with all existing leases and agreements with" Diamond State, which included the Lease. *Id.* § 2.3(b). GT thus stepped into the shoes of Diamond State as the landlord under the Lease.

In the Concession Agreement, GT committed to invest approximately $500 million in the Terminal and a related facility over the first ten years of the agreement. *Id.* § 4.9(c). At the time of trial, GT had invested roughly $118 million. Iannarelli Tr. 454–58. The Concession Agreement also required GT to pay Diamond State a "Concession Fee" as compensation for the right to operate the Terminal. Con. Agr. § 4.3. The Concession Fee is a volume-based fee calculated based on units "handled over the quay . . . [or] in the Premises." *Id.* The "quay" is a synonym for dock. Consequently, if cargo passes over the dock, it has gone over the quay. Iannarelli Tr. 470; *see* DiNapoli Tr. 715.

The Concession Agreement identified both Diamond State and GT as "marine terminal operators under the Shipping Act," but designated GT as "the operating marine terminal operator at the Port." Con. Agr. at '224. As such, GT has the right to publish a tariff for the Terminal. *See* 46 C.F.R. § 525.2(a); Con. Agr. § 21.1. The tariff establishes rates that users of the Terminal must pay for particular services or to conduct specified

activities. The rates in the tariff are enforceable as an implied contract. The tariff rates do not apply if the terminal operator "has an actual contract with a party covering the services rendered by the marine terminal operator to that party." 46 C.F.R. § 525.2(a)(3).

On December 1, 2018, GT published a tariff. *See* JX 43 (the "2018 Tariff" or "2018 Tar."). The 2018 Tariff included a "Terminal Usage Fee" to be "assessed against all cargo discharged or loaded at the Port." *Id.* at '406 (the "2018 Usage Fee"). The 2018 Usage Fee was "designed to . . . cover[]" the cost of the Concession Fee. Iannarelli Tr. 463 ("[W]e would not have implemented a terminal usage fee charge but for the concession fee."). Reflecting that purpose, the 2018 Tariff defined the 2018 Usage Fee as "a charge, separate from Wharfage, against the Stevedore *for fees related to the public private partnership agreement*." *Id.* at '369 (emphasis added). The 2018 Usage Fee imposed a volume-based fee determined by the number of containers or quantity of cargo that passed "over the quay." *Id.* at '406.

The 2018 Tariff did not define "Stevedore," but it did define "Stevedoring" as "the physical handling of Container(s) or Cargo between the Vessel and the CY." *Id.* at '369. The 2018 Tariff defined "Cargo" as "all types of bulk, break bulk, dry bulk or any other forms of Cargo whatsoever, including but not limited to any solid [or] liquid . . . cargo." *Id.* at '367. The 2018 Tariff defined "CY" to mean the "Container Yard within the boundaries of respective Terminal." *Id.* The Terminal did not include the Tanks. *See* Iannarelli Tr. 556–57; DiNapoli Tr. 714.

In the 2018 Tariff, GT did not claim the right to bar access to the Terminal based on unpaid fees. The 2018 Tariff provided that if a user had an overdue balance, then "[t]he

13

Port [has] the right[] to deny anyone the use of a berth until all past due accounts are paid." 2018 Tar. at '379. A "berth" is a vessel's place at the dock. The 2018 Tariff did not warn that a user with an overdue balance could lose access to the Terminal.

## C. The Dispute Over The 2018 Usage Fee

The Company refused to pay the 2018 Usage Fee. By letter dated August 22, 2019, GT notified the Company that it owed $172,401.96 in unpaid fees. JX 44 at '408. GT asserted that by not paying the fees, the Company had violated the 2018 Tariff and breached the Lease. The letter threatened that if the Company failed to pay the amounts due by August 31, the Company would "be denied access to the Port of Wilmington." *Id.*

The Company responded by letter dated August 26, 2019. JX 268. The Company argued that it did not owe the 2018 Usage Fee because it did not employ stevedores or engage in stevedoring. The Company also argued that the rent it paid under the Lease already encompassed the services covered by the 2018 Usage Fee. The Company therefore regarded the 2018 Usage Fee as a "redundant" charge that could not be enforced. *Id.* at 1.

GT did not block the Company's access to the Terminal. Instead, the parties began negotiating a business solution.

## D. The 2020 Tariff

On January 1, 2020, while negotiations were still ongoing, GT issued an updated tariff. *See* JX 45 (the "2020 Tariff" or "2020 Tar."). As relevant to this dispute, the 2020 Tariff redefined the Terminal Usage Fee as "[a] separate charge assessed against the Stevedore." *Id.* at '418 (the "2020 Usage Fee"). GT's general counsel testified that the goal was to make the definition simpler and "more succinct." Iannarelli Dep. 134. Unlike

14

the 2018 Tariff, the 2020 Tariff defined "Stevedore" as "[t]he entity hired to unload the vessel." 2020 Tar. at '418. Consistent with this definition, the 2020 Tariff defined "Stevedoring" as "[t]he act of unloading or loading of ship's cargo from the ship." *Id.*

In the 2020 Tariff, GT took the position that it could block any users with overdue balances from accessing the Terminal. The 2020 Tariff continued to reserve the right "to deny anyone the use of a berth . . . until all past due accounts are paid." *Id.* at '425. It also reserved the right "to deny anyone the use of . . . other Terminal Facilities until all past due accounts are paid." *Id.*

### E.    Buckeye Parent Acquires Magellan.

By agreement dated January 17, 2020, Buckeye Parent acquired 100% of the equity ownership of the Company, and the Company changed its name from "Magellan Terminals Holdings, L.P." to "Buckeye PT Terminals, LP." *See* JX 39; JX 66. The Company's rights under the Lease did not change, and the terminalling business also did not change.

Before acquiring the Company, Buckeye Parent knew about the dispute with GT over the 2018 Usage Fees. Ingalls Tr. 17. Indeed, Buckeye Parent expressly assumed any liability associated with the dispute. *Id.* at 46; JX 39 at '897. Because of the potential liability, Buckeye Parent and Magellan agreed to reduce the purchase price by $400,000. Buckeye Parent also was aware that GT "had threatened  . . . . to block the Port." Ingalls Tr. 47.

On January 20, 2020, GT learned that Buckeye was purchasing Magellan. Iannarelli Tr. 516. On February 10, GT's general counsel emailed Evan Hofmann, Buckeye Parent's general counsel, and stated that GT would "require payment in full of all outstanding

15

invoices with interest in the next ten calendar days." JX 261 at 1. Hofmann responded that "[a]s we discussed last week, due to antitrust laws and other competitive sensitivities, Buckeye will not engage in substantive discussions with GT Wilmington USA, LLC regarding contract or commercial matters prior to the closing of the Magellan-Buckeye transaction." *Id.*; *see* Ingalls Tr. 17. Hofmann confirmed that Buckeye Parent and the Company "remain[ed] willing to address these matters promptly after closing, and are hopeful a long-term commercial resolution can be reached." JX 261 at 1.

## F.     The Dispute Escalates

On March 14, 2020, a week before Buckeye Parent completed its acquisition of the Company, GT emailed Trent Bridges, Magellan's General Counsel, and informed him that GT was "reviewing adjustments to the terminal layout . . . . [that] may impact the current access route that vehicles entering your facility traditionally utilized." JX 235 at '014. GT revoked Magellan's credit with the Port and demanded that Magellan maintain a deposit of $260,000. GT also "rescind[ed] any and all verbal agreements to accrue but not bill terminal usage fees." *Id.* at '015. An attachment listed the Company's outstanding balance as exceeding $1 million. *Id.* at '016. GT set March 31 as the deadline for payment. Bridges forwarded the communication to Hofmann. *Id.* at '011. GT's letter did not state explicitly that GT would block Port access absent payment. Iannarelli Tr. 524–25; *see* JX 235 at '014–15.

No one responded to GT's letter. Buckeye Parent's representative testified that Buckeye Parent was "focused on the task at hand of integrating and operating the terminals, [and] the COVID-19 pandemic." Ingalls Tr. 51–52.

16

By letter dated April 1, 2020, GT threatened to cut off the Company's access to the Port on April 6 if the outstanding balance was not paid. JX 46 at '456. Until that point, the Company had the impression that GT would meet with Buckeye Parent and the Company to discuss a resolution.

In addition to threatening the Company, GT called or sent emails to the Company's customers and carriers to notify them of the impending blockade. The customers that GT contacted included Wawa, Inc., one of the Company's biggest customers. Wawa owns and operates gas stations in the Mid-Atlantic region, and it relies on petroleum product stored at the Tanks to supply its gas stations. Many of its stations need to be resupplied daily, so any interruption in access to the Tanks posed a substantial risk to Wawa's business. The potential blockade therefore greatly concerned Wawa. *See* JX 182; JX 245; Ingalls Tr. 20.

In response to GT's threat, the Company consulted with its legal team and approached GT regarding a resolution. GT would not budge. The Company characterized GT's demands as a "ransom." Ingalls Tr. 21–22.

On April 6, 2020, GT blocked the Company and its customers from using the Disputed Roads to access the Tanks. The blockade took place during the early months of the COVID-19 pandemic, and the Company regarded the blockade as threatening "the critical petroleum infrastructure" in the Mid-Atlantic region. *Id.* at 23. GT's general counsel testified that GT had no regrets about the blockade. Iannarelli Tr. 567–68.

## G.    This Litigation

On the same day that GT blockaded the Disputed Roads, the Company filed this lawsuit and sought a temporary restraining order to bar GT from "(1) threatening to deny

17

[the Company] and/or its customers from accessing the Port of Wilmington; (2) denying [the Company] and/or its customers from accessing the Port of Wilmington; and (3) communicating with [the Company's] customers." Dkt. 2 at 1. On April 6, 2020, the court issued the temporary restraining order and scheduled the case for an expedited hearing on an application for a preliminary injunction. Dkt. 7, 8.

By opinion dated May 20, 2020, the court granted the Company's application for a preliminary injunction. *Buckeye P'rs, L.P. v. GT USA Wilm., LLC*, 2020 WL 2551916 (Del. Ch. May 20, 2020). The court found that the Company

> ha[d] established a reasonable probability of success on the merits of its claims that by blocking access to Sico Road, GT (i) breached the express terms of the Lease, and (ii) breached the implicit terms of the Lease that are supplied by the implied covenant of good faith and fair dealing.

*Id.* at *5. The court entered an injunction designed to maintain the status quo so that the "issues [could] be addressed in due course, rather than by GT forcing [the Company] to capitulate through the exercise of self-help." *Id.* at *9.

The litigation proceeded to trial.

## II.    LEGAL ANALYSIS

There are two overarching issues in the case. The first is whether the Company owes the Terminal Usage Fees. The second is whether the Company has a right to access the Tanks via the Disputed Roads. The Company wins on both.

### A.    The Terminal Usage Fees

The initial dispute between the parties concerned whether the Company owes the 2018 and 2020 Usage Fees. The Company proved that it does not owe those fees.

18

### 1. Principles of Contract Interpretation

Principles of contract interpretation determine the outcome of this dispute. Delaware law controls the issues of contract interpretation. Although GT implemented the  tariffs in accordance with federal regulations, this case does not require the court to interpret those regulations or address any questions of federal law. *See Va. Int'l Terminals v. Va. Elec. & Power Co.*, 21 F. Supp. 3d 599, 605 (E.D. Va. 2014). Both of the tariffs state that Delaware law governs their terms. *See* 2018 Tar. at '366 ("This Tariff and any disputes hereunder shall be governed by, interpreted and construed under Delaware law, without regard to the conflict of laws principles, and the parties agree to submit to the exclusive jurisdiction of the courts of Delaware."); 2020 Tar. at '416 (same). The Lease also specifies that Delaware law governs its terms. Lease § 27(h).

When interpreting a contract, Delaware courts "give words their plain meaning unless it appears that the parties intended a special meaning." *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). "And, in the case of an undefined term, the interpreting court may consult the dictionary, if that is deemed useful, when determining the term's plain meaning." *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *10 (Del. Ch. July 6, 2018).

19

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (footnote omitted). "Even if the Court determines that one party's reading of the contract is more reasonable or natural, that does not preclude a finding of ambiguity." *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2017 WL 2167193, at *2 n.8 (Del. Ch. May 17, 2017) (cleaned up). Where parties have engaged in "bilateral negotiations," and the contract that resulted from those negotiations contains an ambiguous term, then courts may look to extrinsic evidence to resolve the ambiguity. *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998).

In some circumstances, however, extrinsic evidence is unhelpful. "If the contractual language at issue is ambiguous and if [one party] did not negotiate for the agreement's terms, [Delaware courts] apply the *contra proferentem* principle and construe the ambiguous terms against the drafter." *Norton*, 67 A.3d at 360. If "the articulation of contract terms . . . appears to have been entirely within the control of *one party* . . . that party bears full responsibility for the effect of those terms." *SI Mgmt.*, 707 A.2d at 44. This is because "[a]s the entity in control of the process of articulating the terms of the [agreements], it [is] incumbent on the [drafter] to make their terms clear." *Juul Labs, Inc. v. Grove*, 238 A.3d 904, 911 (Del. Ch. 2020) (cleaned up).

GT drafted and issued the tariffs. The Company had no role in drafting them, and the terms were not negotiated.[5] Under applicable federal regulation, the Company is subject to the tariffs even "without proof that [it] has actual knowledge of the provisions of the applicable terminal schedule." *See* 46 C.F.R. § 525.2(a)(2).

Under federal regulation, a tariff is enforceable "by an appropriate court as an implied contract between the marine terminal operator and the party receiving the services rendered by the marine terminal operator." *Id.* Because the tariffs create an implied contract that was not subject to negotiation, any ambiguity is resolved against GT under the principle of *contra proferentem. See Ninivaggi v. Univ. of Del.*, 2021 WL 3709765, at *5 (D. Del. Aug. 20, 2021). If the tariffs are ambiguous, then the Company prevails. GT cannot use extrinsic evidence to show what it really meant, thereby rewriting the tariffs in its favor.

### 2. The 2018 Usage Fee

The Company advances two arguments as to why it has no obligation to pay the 2018 Usage Fee. Both succeed.

First, the Company points out that the 2018 Usage Fee only applies to a "Stevedore." The Company proved that it was not a Stevedore as defined in the 2018 Tariff. Thus, the Company was not subject to the 2018 Usage Fee.

---

[5] Iannarelli Tr. 463, 478 (GT's general counsel describing himself as "the primary drafter" of the tariffs); 2018 Tar. at '363 (stating that the 2018 Tariff was "[i]ssued on December 1, 2018 BY: GT USA Wilmington, LLC); 2020 Tar. at '413 (stating that the 2020 Tariff was "[i]ssued on January 1, 2020 BY: GT USA Wilmington, LLC"); Iannarelli Dep. 135–36 (discussing GT's thought process in changing definitions in the 2020 Tariff).

Second, the Company contends that the rent it pays under the Lease entitles the Company to use the Terminal as it always has, without having to pay any additional amounts. The Company proved that GT did not provide any incremental services to the Company in exchange for the 2018 Usage Fee, and the Company did not engage in any new activities that would warrant charging a fee. The Lease is therefore an existing contract that specifically provides compensation for the Company's longstanding use of the Terminal. The contractually agreed-upon rent therefore takes precedence and precludes the imposition of the 2018 Usage Fee.

### a. Whether The 2018 Usage Fee Applies To The Company

The Company does not owe the 2018 Usage Fee because the Company is not a "Stevedore" as the 2018 Tariff defined that term. Under the 2018 Tariff, the 2018 Usage Fee "is a charge, separate from Wharfage, against the Stevedore for fees related to the public private partnership agreement." 2018 Tar. at '369. The 2018 Tariff capitalized "Stevedore" as if it were a defined term, but the 2018 Tariff did not contain a definition of "Stevedore." The 2018 Tariff did define "Stevedoring" as "the physical handling of Container(s) or Cargo between the Vessel and the CY." *Id.* The 2018 Tariff defined "CY" as the "Container Yard within the boundaries of respective Terminal." *Id.* at '367.

Because the 2018 Tariff defined "Stevedoring," that term provides the best insight into the meaning of "Stevedore" for purposes of the 2018 Usage Fee. *See Lehman Brothers Bank, FSB v. State Bank Comm'r*, 937 A.2d 95, 104 (Del. 2007) (looking to the defined term "located" to interpret the undefined terms "principal office" and "headquarter[s]").

22

Doing so makes sense grammatically because "stevedoring" is simply a verbal form of the noun "stevedore."[6]

Based on the definition of "Stevedoring," the 2018 Tariff defined a Stevedore as someone who engaged in "the physical handling of Container(s) or Cargo between the Vessel and the CY," with the CY defined as the "Container Yard within the boundaries of respective Terminal." 2018 Tar. at '367, '369. The 2018 Tariff defined the "Terminal" as "the Marine Terminal facility, land, pier, wharves, bulkhead, docks and structures, including warehouses operated by the Port of Wilmington, an operation of GT USA Wilmington, LLC." *Id.* at '369. The plain language of this definition refers to the Container Yard within the Terminal. It does not refer to a separate location outside of the Terminal, like the Tanks. *See* Iannarelli Tr. 556–57; DiNapoli Tr. 714.

The Company did not engage in in the "physical handling of Container(s) or Cargo between the Vessel and the [Container Yard]." *See* 2018 Tar. at '367, '369. The Company did not engage in the "physical handling of Container(s) or Cargo." And the Company did not engage in the handling of cargo "between the Vessel and the CY."

### i. "Physical Handling"

The Company proved that it did not engage in the "physical handling of Container(s) or Cargo." Eric Klees has been an employee at the Company or its predecessors for over

---

[6] *Compare Stevedore (n.)*, Webster's Ninth New Collegiate Dictionary (9th ed. 1990) ("[O]ne who works at or is responsible for loading and unloading ships in port."), *with id.*, *Stevedore (vb.)* ("[T]o handle (cargo) as a stevedore; *also* : to load or unload cargo of (a ship) in port ~ *vi*: to work as a stevedore.").

23

thirty-three years. Throughout this career, Klees' "job description has been the same." Klees Tr. 87. One of his roles is a "dock person in charge" (the "Dock Person"). In that role, Klees "stands watch once the vessel comes in and is connected and transfer of product begins." *Id.*

The process over which Klees "stands watch" unfolds as follows. When a vessel arrives, the Dock Person helps secure it to the dock. A vessel with a capacity of fewer than 50,000 barrels provides its own lines to the Dock Person, who uses them to tie the vessel to the dock. A vessel with a capacity of greater than 50,000 barrels hires an independent contractor to secure the vessel to the dock. *Id.* at 92.

Next, an inspector boards the vessel and runs safety calculations. While this is happening, the Dock Person begins the process of connecting a hose between the vessel and the dock. If the vessel has a capacity of fewer than 50,000 barrels, the tankerman on board the vessel uses its crane to pick up its hose and lower it to the dock, where the Dock Person connects it to the manifold. A vessel with a capacity of greater than 50,000 barrels uses its crane to pick up a hose from the dock, then secures it on board the vessel. Once the hose is secured, the vessel and the Dock Person exchange paperwork, fill out Coast Guard forms, and review the procedures for discharging product. *Id.* at 93–95.

To start the discharge of the product, the tankerman, the Dock Person, and the terminal operator each open the appropriate valves. The tankerman controls the valves that connect the hose to the vessel. The Dock Person opens the valve that connects the hose to the manifold. The terminal operator opens valves that determine where the product goes as it runs through the manifold. After an initial "line check" to ensure that there are no leaks,

24

the Dock Person instructs the tankerman to discharge product. The vessel then uses its own pump located on the vessel to move the product through the hose. *Id.* at 96–100. If the product is bound for the Tanks, then it travels through the manifold into pipes that take it approximately 7/8 of a mile to its designated storage location.

During this process, the Dock Person never physically handles any product. Because the Dock Person never engages in the "physical handling of Container(s) or Cargo," the Company was not a Stevedore under the 2018 Tariff and did not owe the 2018 Usage Fee.

### ii.        "Between The Vessel And The CY"

The Company also proved that it did not handle containers or cargo "between the Vessel and the CY." As noted, the 2018 Tariff defined the "CY" as the "Container Yard within the boundaries of respective Terminal." 2018 Tar. at '367. The 2018 Tariff defines "Terminal" as the "Port of Wilmington, an operation of GT USA Wilmington, LLC." *Id.* at '369. The Terminal does not include the Tanks. *See* Iannarelli Tr. 556–57; DiNapoli Tr. 714.

The Company did not take containers or cargo to the Container Yard in the Terminal. As described above, the Dock Person's principal task is to connect the hose to the manifold. Once the vessel begins offloading product, it flows to the Tanks. No one from the Company ever takes product to the Container Yard. *See* Klees Tr. 109 (Q: "When liquid petroleum is being discharged from a vessel, does Buckeye ever store that liquid petroleum in the [C]ontainer [Y]ard?" A: "No.").

GT argues halfheartedly that the phrase "respective Terminal" means there could be multiple terminals. GT then suggests that the dock could be viewed as the Company's

25

"respective" terminal and the Tanks as its container yard. That is a preposterous reading. There is only one Terminal, and only one Container Yard.

It is true that the definition of "CY" refers to the "respective Terminal," and perhaps there are other tariffs that govern multiple terminals. The 2018 Tariff governs only one Terminal. 2018 Tar. at '369. The most logical explanation is that "respective" is a stray word, perhaps from a precedent tariff that governed multiple terminals. Although a court will strive to give meaning to all of the words in a document, it need not contort the language to do so.

### b. Whether The Lease Covered The Services For Which GT Would Charge The 2018 Usage Fee

The Company also demonstrated that the rent it pays under the Lease already covers the Company's longstanding use of the Terminal. GT cannot raise the Company's rent by imposing new fees for what the Company always has been doing. GT could charge fees for new services, and GT could impose fees if the Company began using the Terminal in different ways. But GT cannot rewrite the Lease by imposing fees for uses that the Lease already covers.

Under the federal regulations governing a tariff, the charges in a tariff are generally enforceable as an implied contract, but "[i]f the marine terminal operator has an actual contract with a party covering the services rendered by the marine terminal operator to that party, an existing terminal schedule covering those same services shall not be enforceable as an implied contract." 46 C.F.R. § 525.2(a)(3) (the "Actual Contract Test"). GT attempts to argue that the Lease is not an actual contract, but it plainly is.

26

The Lease is a binding agreement between the terminal operator (GT) and the party using the Terminal (the Company). Under the Actual Contract Test, the label of the contract does not matter. The actual contract could be a lease, an agreement for a specific type of services, or some other species of agreement. What matters is whether (1) there is an actual contract, separate from the tariff, and (2) the contract covers the same services for which the marine terminal operator otherwise would charge under the tariff.

The Lease itself provides for the same rule. Section 27(e) of the Lease states that "[e]xcept as otherwise provided herein, all terms and conditions of the Port of Wilmington, Delaware Terminal Tariff . . . will apply to this Lease." Lease § 27(e). That provision makes clear that the starting point is the Lease, which reflects the parties' specific agreement. If the parties have not agreed upon a specific rate for a particular service, then the terminal operator can charge the tariff rate.

The parties recognized by their conduct that a lease could cover the services that GT as the terminal operator otherwise would charge for under a tariff. After the dispute between GT and the Company arose, the parties negotiated the terms of a potential settlement. The operative document took the form of an amended Lease that would (i) increase and restructure the Company's overall rent while (ii) making clear that the Company would not be charged any separate or additional fees under a tariff. *See* Iannarelli Tr. 503–06; JX 233 at '452 (September 2019 draft amendment agreement).

The real question is therefore whether the rent payment in the Lease covers the "same services" for which GT was charging the 2018 Usage Fee. The legalistic framing of the Actual Contract Test and the esoteric nature of the Company's terminalling business

27

makes the issue seem more complicated than it really is. A hypothetical involving more familiar businesses helps to simplify matters

Assume a mall owner leases space to a shoe store. They agree on a base amount of rent per month. The mall owner worries about high traffic causing additional wear and tear on the premises, so the tenant agrees to pay additional rent based on sales above a minimum threshold (on the assumption that greater sales is a fair proxy for more customers in the store).

Assume that the mall owner offers additional services that tenants can use, such as a location where businesses can store inventory for long periods, a business suite with a copier, and a gym. Further assume that the mall owner posts a schedule of the fees for those services that any tenant can pay a la carte. Some tenants know they will use those services, so they bargain for them in their leases. If the lease provides a rate for a service, then obviously the tenant pays the rate in the lease, not the a la carte rate. That is the basic idea behind the Actual Contract Test.

But the Actual Contract Test does not stop with a specifically identified fee for a specifically identified service. Some services are necessarily covered by the basic business arrangement in the lease, and the mall owner could not charge separately for them. Assume that the mall owner decides to increase revenue by imposing a "Mall Usage Fee" on its tenants calculated as a percentage of sales. The mall owner argues that the costs of maintaining the property have increased, that the fee is necessary to compensate the owner for the use of the premises, and that a sales-based fee is fair because it is an effective proxy for use.

In our hypothetical, the Mall Usage Fee would run afoul of the Actual Contract Test for two reasons. First, the whole point of running a shoe store is to have customers come into the business and buy shoes. A foundational premise of paying rent for space for a shoe store is that customers will come to the mall, enter the store, and buy shoes. The rent that the store owner pays already compensates the mall owner for that component of their business relationship. The mall owner cannot charge an additional Mall Usage Fee for that component because the shoe store would not receive any consideration for the fee. The mall owner would be double-charging for the same services it is already providing under the lease. Second, in our hypothetical, the lease makes the duplicative nature of the Mall Usage Fee particularly clear, because the parties agreed to a sales-based formula for additional rent that would act as a proxy for traffic. There is thus already a specific component of rent that addresses the issue that the mall owner claims to be addressing with the Mall Usage Fee. In our hypothetical, the mall owner could not impose the Mall Usage Fee.

This analysis does not mean that the mall owner cannot charge new fees. The mall owner might provide new services and charge fees for them. For example, the mall owner might invest in ultrafast wifi, make it available to all tenants, and post a fee for using the wifi (the "Wifi Fee"). If the shoe store's lease does not already provide for ultrafast wifi (or perhaps wifi plus upgrades), then the Wifi Fee would not contravene the lease. To have access to the wifi, the tenant would have to pay the Wifi Fee (or enter into a separate arrangement with the mall owner).

The mall owner might even charge fees that would be calculated on the same basis as rent. Assume that the mall owner installs ultrafast wifi and determines the fairest means would be to allocate the cost based on sales. The fact that the shoe store's lease already contemplates variable rent based on sales does not preclude the Wifi Fee. The rental component is for wear and tear on the store. The new fee is for the ultrafast wifi. Once again, to have access to the ultrafast wifi, the tenant would have to pay the Wifi Fee (or enter into a separate arrangement with the mall owner).

It also does not matter for the analysis what the mall owner calls the fee. The name of the fee provides some evidence of the purpose of the fee, but the real question is what the mall owner provides in exchange for the fee.

Finally, it does not matter whether the mall owner charges the fees, or whether the mall owner contracts with a manager to run the mall and gives the manager the authority to charge fees. In the real world, the mall owner would pay a manager, but to make the hypothetical closer to our case, assume the manager pays the mall owner a fee for the right to manage the mall. In return, the manager has the freedom to charge fees for services at the mall. Any fees that the manager imposed would be subject to the same analysis: Does the fee cover something that the shoe store is already paying for under its lease (or another agreement)? The manager could impose the Wifi Fee. The manager could not impose the Mall Usage Fee if that fee simply charged the shoe store an additional amount for engaging in the same activities and using the same services contemplated by the lease.

In this case, the question is whether GT provided a service in exchange for the 2018 Usage Fee that was different from the bundle of consideration already contemplated by the

30

Lease. If the Company's usage of the Terminal and associated services were already contemplated by the Lease, then GT could not impose a usage fee for those same services. If the services were not the same, and if the Company used the services, then GT could impose the fee, because the Company was not already paying for those services under a specific contractual arrangement.

Against this backdrop, GT maintains that the parties' negotiations over the potential amendment to the Lease that would resolve their dispute demonstrate that the Lease did not already address the services covered by the 2018 Usage Fee, but that inference does not follow. GT and the Company were attempting to negotiate a resolution of their dispute over the Terminal Usage Fee; neither side waived its position by attempting to negotiate. *Cf. Brown v. Hous. Ventures, L.L.C.*, 2003 WL 136181, at *5 (Del. Ch. Jan. 3, 2003) ("I do not view the effort to negotiate a resolution as a waiver of any claim to [easement] rights arising by prescription. It is prudent to resolve through negotiation and documentation that which might otherwise give rise to, as it did here, litigation." (footnote omitted)).

For its part, the Company argues that the Volume-Based Fee must preempt the 2018 Usage Fee because both are calculated based on the amount of product that crosses the dock. As the hypothetical involving the shoe store illustrates, the method of calculating the fee is not dispositive, and the Company's conduct demonstrates that fact. Since 2009, the Company has paid a security fee that is also calculated based on the amount of product that crosses the dock. *See* 2018 Tar. at '405–06; JX 150 at '972. The Company accepts that fee because it compensates the terminal operator for providing additional security services that were not already contemplated by the Lease.

31

The focus of the inquiry instead is on what services GT provided in exchange for the 2018 Usage Fee. Assuming for the sake of argument that the Company was acting as a Stevedore, the Company was not responsible for the 2018 Usage Fee because GT did not provide any consideration in return for the fee beyond the exchange of consideration already covered in the Lease. GT expressly described the 2018 Usage Fee as a charge "for fees related to the public private partnership agreement." 2018 Tar. at '369. The plain language of this definition makes clear that GT sought to pass along the costs of the concession fee it agreed to pay to Diamond State, plus some margin for profit, by imposing the fee on the Port's customers.

Although the plain language is dispositive, the extrinsic evidence confirms that the 2018 Usage Fee was simply a way for GT to pass through the amounts it had agreed to pay to Diamond State for the concession fee, plus some margin for profit. GT's general counsel explained that GT "would not have implemented a terminal usage fee charge but for the concession fee." Iannarelli Tr. 463; *see also id.* at 463–64 (Q: "So the sole reason that GT even imposes and drafted the terminal usage fee is to cover the costs of paying the concession fee to the State of Delaware; right?" A: "Yes.").

GT did not provide any incremental services in exchange for the 2018 Usage Fee, and the Company did not engage in any additional activities that would have warranted charging the 2018 Usage Fee. The Company continued conducting its business precisely as before, based on the bundle of consideration exchanged in the Lease. By imposing the 2018 Usage Fee, GT sought to charge the Company for rights it already possessed under the Lease.

32

Under the Actual Contract Test, GT could not charge the Company a fee for the rights it already possessed under the Lease. The Company already paid rent in exchange for the right to use the dock and the pipes running under the Terminal as part of its business. That does not mean that GT could not impose specific fees for services that were not covered by the Lease. What GT could not do was impose a generic fee for services already covered by the Lease.

The 2018 Usage Fee was not enforceable as an implied contract because it fails the Actual Contract Test. If the Company had been acting as a Stevedore under the 2018 Tariff, it still would not have been subject to the 2018 Usage Fee.

### 3. The 2020 Usage Fee

The Company raises the same challenges to the 2020 Usage Fee. This decision must analyze the 2020 Usage Fee separately because the 2020 Tariff changed the relevant language.

Most notably, the 2020 Tariff redefined the "Terminal Usage Fee" as "[a] separate charge assessed against the Stevedore." 2020 Tar. at '418. GT thus eliminated the reference in the 2018 Tariff that plainly associated the charge with "fees related to the public private partnership." *See* 2018 Tar. at '369.

The 2020 Tariff also changed the definition of "Stevedoring." In place of the reference to moving cargo to and from the Container Yard, the 2020 Tariff defined the term more broadly as "[t]he act of unloading or loading of ship's cargo from the ship." 2020 Tar. at '418.

Finally, the 2020 Tariff introduced a new definition of "Stevedore." It defined that term as "[t]he entity hired to load or unload the vessel." *Id.*

Despite these differences, the result is the same. The Company proved it was not a "Stevedore" and hence not subject to the 2020 Usage Fee. Assuming that the Company was properly subject to the 2020 Usage Fee, the Company proved that GT could not charge the 2020 Usage Fee because the Company was already paying for all of the services it used in its business under the Lease.

### a. Whether The 2020 Usage Fee Applies To The Company

The Company first argues that it was not subject to the 2020 Usage Fee because it did not act as a "Stevedore," this time as defined under the 2020 Tariff. Whether the Company met the definition of Stevedore turns on whether the Company was "hired to load or unload" a vessel. *See* 2020 Tar. at '418. The Company maintains that it did not "load or unload" a vessel. GT argues that the Company did. The Company and GT have each advanced a reasonable interpretation, causing the 2020 Usage Fee to be ambiguous. Under the doctrine of *contra proferentem*, ambiguous language is interpreted against GT as drafter. The 2020 Usage Fee therefore does not apply to the Company.

The Company's argument begins with the dictionary definitions of "load" and "unload." "Load" is "to put something to be carried into or upon . . . [to *load* a wagon with wheat]" or "to put into or upon a carrier [to *load* coal into a truck]." *Load*, Webster's New World Dictionary (2d College Ed. 1986). "Unload" is "to remove or take off (a load, cargo, etc.)" or "to take a load or cargo from." *Id.*, *Unload*. Both definitions connote activity. One cannot passively "load" or "unload."

34

Against this definitional backdrop, the Company argues that the Dock Person did not "load" or "unload" vessels. The Company relies on Klees' testimony about what the Dock Person does when a vessel arrives. Klees testified credibly that he acts as a coordinator. The only step that the Dock Person performs is to open a valve. Klees explained that the person who actually determines whether the product leaves the vessel is the tankerman, because the tankerman is the operator of the pump that moves the product. The pump is located on the vessel and belongs to the vessel; no one from the Company has "any control over running that pump." Klees Tr. 100. The product is pumped from the vessel to wherever the Company wants it to go, but it is the vessel that unloads the product by pumping it out. *Id.* at 119. By opening the valve, the Dock Person is "just providing a means for product to be moved by the pump." *Id.* at 121–22; *see id.* at 122 ("[A]s the dock person in charge, I'm not moving any of the oil. I'm providing a means for the tankermen to push the product."). Under the Company's reading, the person that loads or unloads the vessel is the person who causes the product to run through the hose and the pipelines. That person is the tankerman who controls the pump. *Id.* at 119.

GT responds that this interpretation is overly formalistic. GT looks at the operation as a whole and sees a vessel that starts out full of product and ends up empty. GT argues with considerable force that however you slice it, that process constitutes the unloading of a vessel. A team of people make it happen. That team consists of the tankerman, the terminal operator, and the Dock Person. All three participate in the process. All three are necessary. GT concludes that the Dock Person is participating in the unloading of a vessel. *See* DiNapoli Tr. 708.

35

Both interpretations are reasonable, resulting in ambiguity. In a bilateral contract, the court would look to extrinsic evidence. Here, the doctrine of *contra proferentem* is dispositive. Because the definition was ambiguous, the Company was not subject to the 2020 Usage Fee.

If the court looked to extrinsic evidence, the Company's interpretation would still prevail. "[E]xtrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry." *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834–35 (Del. Ch. 2007) (cleaned up). The extrinsic evidence is mixed, but three pieces of evidence are the most probative and favor the Company.

First, the experts agreed that the term "stevedore" is most commonly associated with dry cargo operations. Van Hemmen Tr. 372–73; DiNapoli Tr. 709, 730, 736. The Company does not engage in dry cargo operations. The Company engages in bulk-liquid petroleum operations.

Second, GT's general counsel testified that when revising the 2020 Tariff, he used Google to find a definition of "Stevedore." Iannarelli Dep. 135. The Company's expert conducted Google searches and could not locate any images involving liquid bulk operations. All of the images depicted dry cargo operations. Van Hemmen Tr. 382.

Third, GT's expert agreed that "stevedore" and "longshoreman" are interchangeable terms. DiNapoli Tr. 732. He agreed that the Company does not employ longshoremen. *Id.* Indeed, to act as a stevedore at the Port requires an agreement with the International Longshoremen Association. Iannarelli Dep. 79; Van Hemmen Tr. 395. The Company has

36

no such agreement, and no one who serves as Dock Person is a member of the union. Klees Tr. 109.

In response, GT made much of the fact that Murphy Marine, a company hired by Citrosuco North America, Inc. ("Citrosuco") to offload bulk fruit juices, paid the 2020 Usage Fee and thus presumably was a stevedore. *See* Iannarelli Tr. 468. The actions of Murphy Marine are relevant, but not dispositive. Murphy Marine could simply have made a business decision not to fight about the fee. The evidence also did not provide a sufficient basis for the court to compare Citrosuco's process with the Company's. GT's general counsel claimed that they were similar, but a cursory description from a lawyer was not sufficiently persuasive. *See* Iannarelli Tr. 467–68. GT also introduced into evidence a "Stevedoring and Terminal Services Agreement" with Citrosuco dated September 25, 2019. JX 168 at '734. GT entered this agreement after the dispute with the Company arose and had an incentive to style the agreement to provide support for its position in this case. What matters for present purposes is not the language in GT's agreement with Citrosuco, but the language in the 2020 Tariff.

The Company thus proved that it did not act as a Stevedore for purposes of the 2020 Tariff. The Company therefore was not subject to the 2020 Usage Fee.

### b. Whether The Lease Covered The Services For Which GT Charged The 2020 Usage Fee

Assuming for the sake of argument that the Company was subject to the 2020 Usage Fee, the Company again argues that the Lease already covers its use of the Terminal for its longstanding terminalling business. The Actual Contract Test again guides the analysis,

37

and it leads to the same result. Because the Lease already covered the usage and services involved in the Company's traditional terminalling business, GT could not impose the 2020 Usage Fee.

The proper inquiry again is to compare the services that the Company ostensibly received in exchange for the 2020 Usage Fee with the bundle of consideration that the parties agreed to in the Lease. GT did not demonstrate that the 2020 Usage Fee covered any additional or different services. Although GT used different language, GT's purpose in imposing the 2020 Usage Fee was identical to its purpose for imposing the 2018 Usage Fee. GT sought to recover the payments it made to Diamond State, plus make an additional profit.

As discussed in the preceding section, GT styled the 2020 Usage Fee as compensation to GT from those using the Terminal for the loading and unloading of cargo. The Lease plainly covers that. The stated purpose of the Lease is for "operating certain docking facilities for the transportation and storage of oil, petroleum products, hydrocarbons and their derivatives and for the installation and operation of a mooring dolphin with catwalks and utilities." Lease at '754. The Lease later states that "[t]he Premises may be used and occupied for the purpose of operating certain docking facilities for the purpose of transportation and storage of oil, petroleum products, hydrocarbons and their derivatives." *Id.* § 7(b). The Lease also confirms that the "Premises" include not only 1,160 linear feet of docking space, but also the permanent structures that create the dock, as well as the equipment necessary for ships to use the dock to load and unload petroleum products, such as "breasting dolphins, mooring dolphins, platform, dock deck, catwalks,

38

sea wall, and spill pump collection system for pier and ship discharge." *Id.* § 2. The Lease later acknowledges that the Company maintained movable structures that it utilized "to facilitate docking operations, including but not limited to, loading arms, spill pans, grating, covers, pre-fab type structures as a dock house, valves, piping, supports and other miscellaneous equipment and machinery." *Id.*

The Lease thus recognizes that the Company rents the Premises to conduct its terminalling operation, and the Company pays the rent specified in the Lease for the purpose of securing the Premises for its terminalling operation. That purpose included transferring petroleum product to or from a vessel in the manner described above.

Given the terms of the Lease, GT could not impose a usage fee on the Company that charged an incremental amount for the Company to do what it was already doing under the Lease. If the Company sought to use other aspects of the Terminal in a manner not already covered by the Lease, then GT could charge a fee for the Company's additional use. The 2020 Usage Fee is not enforceable as an implied contract because the Lease covers the same services as the 2020 Usage Fee.

## B.     The Right To Use The Disputed Roads

After the dispute emerged over the Company's obligation to pay the Terminal Usage Fees, GT engaged in self-help by preventing the Company and its customers from using the Disputed Roads. The second major issue in this case is whether the Company has any right to use the Disputed Roads.

The Company advanced multiple theories to support its right to use the Disputed Roads. The Company prevailed on only one: Under the implied covenant of good faith and

39

fair dealing that inheres in the Lease, the Company has a contractual right to use the Disputed Roads to access the Tanks in connection with its terminalling business.

The Company advanced four other theories in an effort to establish an access right. They are:

- That the Disputed Roads are public roads.

- That the Company has an express easement to use the Disputed Roads.

- That the Company has a prescriptive easement to use the Disputed Roads.

- That the Company has an easement by estoppel to use the Disputed Roads.

This decision addresses those theories because each would provide the Company with a more durable and more expansive right of access than the implied term in the Lease. The holding that the Lease incorporates an implied right for the Company to use the Disputed Roads to access the Tanks in connection with its terminalling business therefore does not obviate the need to consider the Company's other theories. Instead, those theories fail on their own merits.[7]

---

[7] The Company's other theories seek to adjudicate the status of ownership rights in the Port, either by declaring that the Disputed Roads are public roads, or by finding that the Port is burdened by an easement. Diamond State owns the Port, and Diamond State is not a party to the case. Because the Company's arguments fail for other reasons, the court need not consider whether it could adjudicate those ownership issues in Diamond State's absence. There are obvious problems with doing so. The Company has advanced arguments in response based on GT's rights under the Concession Agreement, the fact that GT and Diamond State are in privity, and the fact that Diamond State had ample notice of this proceeding and did not intervene. The Company also suggested that the court could limit any ruling to an *in personam* determination binding only on GT. The court expresses no view on those issues.

### 1. A Live And Justiciable Dispute Continues To Exist.

As a threshold matter, GT contends that there is "no practical need" to address the access issue because the underlying dispute between the parties involved whether the Company owed the Terminal Usage Fees. Dkt. 214 at 26. GT says it only blocked the Company's access because of the unpaid fees, so resolving the fee issue renders the access issue moot. That is not the case. There remains an actual and ripe controversy between the parties over the Company's right to use the Disputed Roads. The issuance of a declaratory judgment is warranted to resolve that dispute.

"Delaware courts are statutorily authorized to entertain an action for a declaratory judgment, provided that an 'actual controversy' exists between the parties." *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216–17 (Del. 2014) (footnotes omitted). The Delaware Supreme Court has established a four-part test for determining whether an actual controversy exists:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking de[c]laratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.

*Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973). The Company satisfies all four prerequisites.

The dispute over the Company's right to use the Disputed Roads easily satisfies elements one, two, and three, and GT does not appear to contest them. First, the Company seeks a declaratory judgment that it has the right to use the Disputed Roads to access the

41

Tanks. GT maintains that the Company lacks any right to use the Disputed Roads to access the Tanks and only may do so with GT's permission, which GT can grant or withhold in its sole discretion. Second, the Company is asserting its rights against a party with an interest in contesting the claim. Under the Concession Agreement, GT operates the Port on behalf of Diamond State, and GT wants to maintain its ability to restrict the Company's use of the Disputed Roads if, for example, there is a future dispute with the Company. Third, the Company and GT's interests are real and adverse. The dispute about access rights is not manufactured. It arose when GT blocked the Company's access, and GT maintains that if it wants, it can block the Company's access again. In the 2020 Tariff, GT made this assertion explicit by reserving the right "to deny anyone the use of a berth or other Terminal Facilities until all past due accounts are paid." 2020 Tar. at '425.[8]

---

[8] The 2020 Tariff broadly defines "Terminal Facilities" as:

> One or more structures comprising a terminal unit, and include, but are not limited to wharves, warehouses, covered and/or open storage spaces, cold storage warehouses, and/or bulk cargo loading and/or unloading structures, landings, and receiving stations, used for the transmission, care, and convenience of cargo and the interchange of same between land and water carriers or between two water carriers.

*Id.* at '418. In drafting the 2020 Tariff, GT notably expanded the language of the 2018 Tariff, which only reserved the right to "deny anyone the use of a berth until all past due accounts are paid." 2018 Tar. at '379.

The most recent tariff, effective January 1, 2022, contains a reservation of rights identical to the 2020 Tariff. See Port of Wilmington Terminal Tariff, *GT USA Wilmington LLC* 14 (issued Dec. 1, 2021, effective Jan. 1, 2022), *available at* https://www.portofwilmington.com/tariff.html ("The Terminal Operator reserves the

As to the fourth element, "[a] case is ripe for judicial review when the dispute has matured to the point where the plaintiff has suffered or will imminently suffer an injury." *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 816 (Del. 2018). "A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form." *XL Specialty*, 93 A.3d at 1217 (cleaned up). An actual controversy is ripe if the court is "not only . . . convinced that litigation sooner or later appears to be unavoidable, but also that the material facts are static and that the rights of the parties are presently defined rather than future or contingent." *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 481 (Del. 1989) (cleaned up).

Under a commonsense assessment, the dispute over access rights needs to be resolved. GT's assertion of its position has already inflicted injury on the Company when GT blocked the Company from using the Disputed Roads to access the Tanks. That injury would have metastasized absent this court's issuance of injunctive relief. Without a judicial resolution, the Company could suffer a similar injury at any point, because GT claims that it has the ability to cut off the Company's access at any time. The material facts underlying the dispute are static, and the relative rights of the parties are presently defined. The access issue is therefore ripe for determination. And resolving the dispute over the Terminal Usage Fees did not render the access issue moot. Whether the Company has an enforceable access

rights to deny anyone the use of a berth or other Terminal Facilities until all past due accounts are paid.").

43

right is a question that exists independent of whether the Company owed the Terminal Usage Fees.

This case therefore satisfies all four elements of the actual controversy test. The issue of whether the Company has an access right is the proper subject of a declaratory judgment.

### 2. The Implied Covenant Of Good Faith And Fair Dealing

The Company proved that under the implied covenant of good faith and fair dealing that inheres in the Lease, the Company has the right to use the Disputed Roads in connection with its terminalling business. The court will issue a declaratory judgment to that effect.

The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.

*Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (cleaned up). To prevail on an implied covenant claim, a plaintiff must prove "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998). Because the Company is only seeking a declaratory judgment regarding its rights under the Lease, the Company need only prove a specific implied contractual obligation.

44

When determining whether to invoke the implied covenant, a court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE). "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill." *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014). The court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010). "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009).

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled." *Allen*, 113 A.3d at 183. One reason a gap might exist is if the parties negotiated over a term and rejected it. The implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party "failed to secure . . . at the bargaining table." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004).

But contractual gaps may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency." *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008). "In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible." *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

Equally important, "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* § 570, at 601 (Kaufman Supp. 1984)). "The implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement." *Dieckman*, 155 A.3d at 361.

Once the plaintiff has established the existence of a contractual gap that can be filled, the plaintiff must show "from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter." *Katz*, 508 A.2d at 880. "The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013) (cleaned up), *overruled on other grounds by Winshall v. Viacom*

46

*Int'l, Inc.*, 76 A.3d 808, 814 n.13 (Del. 2013). A reviewing court does not simply introduce its own notions of what is "fair or reasonable under the circumstances." *Allen*, 113 A.3d at 184. Although its name includes the concepts of "good faith" and "fair dealing," the implied covenant does not establish a "free-floating" requirement that a party act in some morally commendable sense. *Gerber*, 67 A.3d at 418 (cleaned up). When used with the implied covenant, the term "good faith" contemplates "faithfulness to the scope, purpose, and terms of the parties' contract." *Id.* at 419 (cleaned up) (emphasis omitted). It "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 cmt. a (Am. Law Inst. 1981), Westlaw (database updated Oct. 2021). The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Gerber*, 67 A.3d at 419 (cleaned up). The application of these concepts turns "on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally." *Id.* (cleaned up) (emphasis omitted).

To supply an implicit term, the court "looks to the past" and asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.* at 418 (cleaned up). The court seeks to determine

> whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter.

*Id.* (cleaned up).

The Delaware Supreme Court has admonished courts against a free-wheeling approach to the implied covenant. Invoking it is a "cautious enterprise." *Nemec*, 991 A.2d at 1125. Implying contract terms is an "occasional necessity . . . to ensure [that] parties' reasonable expectations are fulfilled." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (cleaned up). Its use "should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness." *Id.* (cleaned up).

### a. The Lease Does Not Expressly Address Use Of The Disputed Roads.

The contractual gap in this case concerns the Company's ability to use the Disputed Roads as part of its terminalling business. It is undisputed that the Lease does not address this topic explicitly.

GT argues that the Lease contains a mechanism to address access rights and other issues by authorizing the Company to request "easements in addition to those comprising Tenant's Easement[s]" if they "are necessary or desirable for the performance of Tenant's business." Lease § 9. The Tenant's Easements are for "existing and planned dock lines" and the "Conectiv pipeline," as well as an easement to "facilitate" those dock lines and the pipeline. *Id.* § 2. If additional easements are "necessary or desirable," then "the Tenant shall request that Landlord grant such easements or negotiate with the party by whom the easements must be granted. Any such easements are subject to the reasonable approval of Landlord." *Id.* GT argues that the Company should have asked for an easement to use the Disputed Roads as directed by Section Nine of the Lease.

48

GT's argument is misplaced, and Section Nine does not affect the implied covenant analysis. Section Nine provides a mechanism for requesting an easement when an additional easement is "necessary or desirable" at some point in time *after* the parties entered the Lease. It does not govern the implied covenant analysis, which asks whether the parties *at the time of contracting* would have addressed a matter had it not been so obvious that the parties did not discuss it.

There is no need for the Company to have an easement to use the Disputed Roads, precisely because of the implied covenant. The license that the Lease implicitly grants is sufficient.[9]

If the Company did not have an implied right to use the Disputed Roads under the Lease, and if the Company had no other means of accessing the Tanks, then the Company could seek to invoke Section Nine. The Company has not pursued that alternative in this

---

[9] *See* Restatement (First) of Property, Div. V, Part II, at Intro. Note (Am. L. Inst. 1944), Westlaw (database updated Dec. 2021) ("The term 'license' . . . describe[s] those interests in land consisting of the privilege to use land in the possession of another which arise out of the consent of the possessor of the land and which are not included within the definition of easements."); Tiffany Real Property, *supra*, § 830 (noting that a license "may be in writing or oral," or "[i]t may be implied from the relations of the parties"). Easements and licenses are distinct. "An easement is a non-possessory interest in real property, granted for a particular purpose, enforceable of right and not depend[e]nt for its continued existence on the will of the grantor." *Coker v. Walker*, 2013 WL 1858098, at *3 (Del. Ch. May 3, 2013). A license, by contrast, is generally terminable at will by the licensor. *See* Restatement (First) of Property, *supra*, § 519. But "[t]he fact that a license is terminable at the will of the licensor does not necessarily mean that the licensor can terminate it without incurring liability for doing so." *Id.* cmt. b. For example, "[t]he licensor may be bound by contract not to so exercise his will as to terminate the license, and when so bound will be liable in damages for breach of his contract." *Id.*

case, and the outcome of this decision means that the Company does not have grounds to do so.

### b. Ongoing Access Was A Basic Premise Of The Negotiations That The Parties Did Not Think To Address.

The next question is the reason for the gap. If the Lease does not include an express contractual right to use the Disputed Roads to access the Tanks because the parties bargained over the issue and rejected that term, then the implied covenant has no role to play.

The record at trial demonstrates that during the negotiations over the Lease, Diamond State and the Company did not address whether the Company could have a contractual right to use the Disputed Roads to access the Tanks for its terminalling business. The parties did not address that issue because the reality of the Company's access was so fundamental that it did not warrant consideration.

While the parties were negotiating the Lease, the Company was using the Disputed Roads for its terminalling business. The Company could not conduct its terminalling business without using the Disputed Roads. Ingalls Tr. 33. For over three decades, since 1973, the Company or its direct predecessor had conducted the same terminalling business at the same location, and they had done so under a predecessor lease that the parties were negotiating to replace.[10] Comparable operations took place on that site going back to the

_____

[10] *See* Lease at '757 ("WHEREAS, Tenant is currently leasing portions of the DSPC Leased Property pursuant to that certain Lease Agreement dated August 23, 1973, as amended (the 'Original Lease'); and . . . WHEREAS, the parties now desire to terminate the Original Lease and enter into this Lease to set forth the terms and conditions pursuant

50

1920s, when SICO first acquired the Buckeye Properties, leased land from the Port to construct a dock, and began operating a terminalling business.[11] At least as early as 1975, maps referred to the road in and out of the Company's property as "SICO Road," evidencing that SICO used the road in its terminalling business. Hoffman Report ¶ 29. The parties thus negotiated against some nine decades of established practice. At the same time, they were negotiating a lease that could last for up to forty-three years and which contemplated that the same terminalling business would continue during that period.[12] This evidence establishes that Diamond State and the Company negotiated with the background understanding that the Disputed Roads could be used to access the Tanks in connection with the terminalling business.

---

to which Landlord shall lease the Premises (as hereinafter defined) to Tenant and Tenant shall lease the Premises from Landlord").

[11] *See* JX 78 at 1 (evidencing that in 1926, SICO entered into a lease with the Board of Harbor Commissioners to "construct piers and bulkheads along the Delaware River adjoining the Marine Terminal" for use in conjunction with a terminalling business to be conducted on the Buckeye Properties involving "th[e] importation and distribution of petroleum products"); Hoffman Report ¶ 37 (discussing interview with Frank Eichler, an individual who worked at SICO beginning in the 1950s, who recalled that SICO had the ability to access the Port "to support the oil storage use, which has always included bringing oil into the Port by ship, piping it to the tank on the adjoining property, and removing it over and through the Port by truck or rail"); JX 118 § 7(A) (lease dated September 1, 1973, between SICO and the Delaware Terminal Company to use Buckeye Parcel #2 for "the construction, operation and maintenance of terminalling and storage facilities for petroleum and petroleum products"). *See generally* Hoffman Tr. 152–81 (discussing historical evidence regarding conduct of terminalling business from 1920s to present).

[12] *See* Lease § 3 (providing for an initial term of approximately three years plus eight renewal terms of five years each); *id.* at '754, '757–58 (provisions in Lease recognizing nature of Tenant's business).

GT contends that the Company asked for a right to access the Port for its terminalling business and that Diamond State rejected the Company's request. That contention misconstrues the evidence. At the very end of an arduous and prolonged negotiation, the Company asked Diamond State for an exclusive easement to use the Disputed Roads in its terminalling business. *See* JX 305 at lines 161–63 (indicating the Company's request for an additional "exclusive easement for Tenant and Tenant's customers providing vehicular and truck access to Tenant's Wilmington Terminal to facilitate receipt and delivery of petroleum products ('Tenant's Access Road')."). That "exclusive easement" would have been exclusive, i.e., only the Company could have used the Disputed Roads. It also would have been an easement, i.e., a recorded property right rather than a contractual license. *See* Bailey Tr. 666–67.

Diamond State rejected the last-minute request for an exclusive easement. Parul Shukla, Diamond State's Chief Financial Officer, memorialized Diamond State's position in a contemporaneous markup of the Lease. Next to the Company's request, he wrote: "No: we have neither discussed exclusivity of the easement nor access." JX 305 at 37. Bailey recalled events similarly. He explained that the Company's request went nowhere because Diamond State did not provide exclusive access easements to anyone. Bailey Tr. 666–67, 670.

The parties did not negotiate over including a contractual right to use the Disputed Roads as a provision in the Lease. Shukla's note confirms that the issue had not come up previously and only arose in the form of the last-minute request for an exclusive easement. *See* JX 305 at 37 ("[W]e have [not] discussed . . . access.). Diamond State rejected the

52

request for an exclusive easement, but everyone understood that the Company could access the Disputed Roads for purposes of its terminalling business. The reality of access was a fundamental premise of the Lease.

### c. The Implied Term

The Company proved that if the parties had thought to address whether the Company had a contractual right to use the Disputed Roads for purposes of its terminalling business when negotiating the Lease, then they would have agreed that the Company could make reasonable use of the Disputed Roads for that purpose, just as the Company or its immediate predecessor had been doing since 1973, and just as other predecessor companies had been doing since the 1920s. Stated conversely, they would have agreed that the Landlord could not block the Tenant or its customers from making reasonable use of the Disputed Roads for purposes of the Company's terminalling business.

The existing provisions of the Lease demonstrate that the parties recognized the nature of the Company's business, the inherent linkage between the dock and the Tanks, and the need for the Company and its customers to make reasonable use of the Disputed Roads to access the Tanks. In the Lease, the Company leased "[a]pproximately 1,160 linear feet of dock space" from Diamond State. Lease at '754. The "Reference Page" for the Lease summarizes its purpose as follows: "For the purpose of operating certain docking facilities for the transportation and storage of oil, petroleum products, hydrocarbons and their derivatives and for the installation and operation of a mooring dolphin with catwalks and utilities." *Id.* Similar language appeared in Section 7(b) of the Lease. *See id.* § 7(b). The

53

plain language of these provisions demonstrates an understanding of the Company's terminalling business.

Section 2 of the Lease states that in addition to the approximately 1,160 linear feet of dock space, the Landlord grants the Tenant

> full rights of access for ingress and egress to the dock, walkway, and if available, reasonable parking space at the dock, and ingress and egress over existing roads owned or controlled by Landlord for access to the dock (collectively the "Premises") and as depicted on the drawing marked as **Exhibit "A"** attached hereto and made a part hereof.

*Id.* § 2. The Landlord also committed to grant and convey to the Tenant "an easement with rights and privileges for all existing and planned dock lines and the existing Conectiv pipeline" and a further easement "to facilitate Tenant's dock lines and the Conectiv pipeline." *Id.* And in a related easement, Diamond State granted the Company a "pipeline easement and a temporary construction easement over and across a portion of the [Port] in connection with the construction of the new Pipelines." JX 54 at '660 (Recitals); *see* Lease §§ 2, 9. The easement allowed the Company to access the Port "to survey, construct, install, operate, protect, use, inspect, maintain, replace, remove and repair the Pipelines." JX 54 § 1(a).

Through these provisions, the Lease recognized the obvious connection between the dock and the Tanks. Under the Lease, the Tenant leased the dock "for the transportation and storage" of liquid petroleum. Lease at '754. The storage function takes place at the Tanks. In the Lease, the Landlord committed to grant the Tenant an easement for the pipes that run under the Port and connect the dock to the Tanks. Those pipes are used to transport petroleum to the Tanks for use in the Company's terminalling business. Customers retrieve

54

liquid petroleum from the Tanks using tanker trucks, which only can access the Tanks by using the Disputed Roads. The business arrangement contemplated by the Lease relies on the seamless transportation of liquid petroleum from the dock to the Tanks and from the Tanks to customers.

The Volume-Based Fee further evidences an understanding that the Company was conducting a terminalling business that involved the Tanks. To reiterate, Section 5(c) of the Lease stated,

> In addition to Rent, Tenant shall pay to Landlord a fee based on the total number of barrels of oil, petroleum products, hydrocarbons and their derivatives crossing the dock entering into the Premises plus the total number of barrels of oil crossing the dock exiting from the Premises annually throughout the term of this Lease.

*Id.* § 5(c). The Lease contains the Volume-Based Fee because the parties understood that the Company transfers liquid petroleum products from ships, across the dock, through pipes under the Port, and into the Tanks, where its customers pick up the products using tanker trucks. For the business to function, the Company's customers needed to access the Tanks via the Disputed Roads. Without that access, the commercial arrangement documented in the Lease makes no sense.

Extrinsic evidence confirms the understanding that the Lease reflects. For twelve years after executing the Lease, the Company used its access rights to provide the terminalling services described in the Lease. During that period, the Disputed Roads provided the only means of accessing the Tanks. During that period, the Company and its customers used the Disputed Roads to access the Tanks. Not only that, but the broader

55

historical evidence demonstrates that the Company and its predecessors have conducted the same or a comparable terminalling business for nearly a century.

It follows that if the parties had thought to address whether a contractual right to use the Disputed Roads existed, then they would have agreed that the Company could make reasonable use of the Disputed Roads for its terminalling business. The Lease would have provided that the Landlord could not block the Tenant or its customers from making reasonable use of the Disputed Roads for purposes of accessing the Tanks. The implied covenant can supply this omitted but obvious term.

### d. Issues Of Compelling Fairness Warrant Recognizing The Implied Term.

The final question is whether this case is one where the implied covenant should be deployed. As this decision has acknowledged, the implied covenant must be used sparingly. "When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement . . . ." *Libeau v. Fox*, 880 A.2d 1049, 1056 (Del. Ch. 2005), *aff'd in part, rev'd in part*, 892 A.2d 1068 (Del. 2006). "Delaware courts rightly employ the implied covenant sparingly when parties have crafted detailed, complex agreements, lest parties be stuck by judicial error with duties they never voluntarily accepted." *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *7 (Del. Ch. Apr. 20, 2009). To reiterate, the application of the implied covenant "should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness." *Dunlap*, 878 A.2d at 442 (cleaned up).

56

This is a case where invoking the implied covenant is grounded in reasons of compelling fairness. GT maintains that the Company lacks any legal or equitable access right, meaning that GT can cut off the Company's access in its sole discretion. Under that scenario, the Company's business exists as a matter of GT's grace. GT can demand whatever terms it wishes and impose any fees it wants, and if the Company does not submit, then GT can destroy the Company's business by blocking the Disputed Roads.

If the Company and Diamond State had thought to negotiate over a contractual right of access, they never would have agreed that the Landlord could block access in its sole discretion. It can be said with confidence that the Company never would have accepted that arrangement because access to the Tanks is essential to the terminalling business, and the Company would not have agreed to terms that left it at the Landlord's mercy. The Company would have insisted on protections so that any dispute could be litigated.

On the facts of this case, recognizing an implied contractual right to use the Disputed Roads is necessary to preserve the spirit of the parties' bargain. The court therefore will enter a declaration establishing that the Lease includes an implied term permitting the Company and its customers to make reasonable use of the Disputed Roads to access the Tanks for purposes of the Company's terminalling business.

### 2. The Public Road Argument

In its lead argument, the Company boldly asserts that the Disputed Roads are public roads. The Company understandably gives pride of place to this argument because it is the most powerful. If true, then GT cannot restrict anyone's use of the Disputed Roads. The public, including the Company, could access the Disputed Roads, and it would be

necessary for the State of Delaware to pursue a vacation proceeding to terminate the right of public access. At first blush, this theory sounds so extreme as to be inconceivable. Yet the Company presented a rich historical account of the Port which provides some support for this theory. Ultimately, however, the evidence is not sufficiently persuasive to carry the Company's burden.

In Delaware, "[a]ll public roads, causeways and bridges laid out as such, or made by lawful authority, or which have been used as such and maintained at the public charge for 20 years or more are declared to be common highways." 17 *Del. C.* § 509. "Section 509 has been construed as recognizing three alternative methods for creating a 'common highway': (1) formal dedication by a private owner; (2) official dedication by a public authority; or (3) twenty years of public use and public maintenance." *Scureman v. Judge*, 626 A.2d 5, 20 (Del. Ch. 1992), *aff'd sub nom. Wilm. Tr. Co. v. Judge*, 628 A.2d 85 (Del. 1993) (TABLE); *see Amer v. NVF Co.*, 1994 WL 279981, at *3 (Del. Ch. June 15, 1994) ("Generally, absent express dedication and acceptance, a road does not become a public road unless the public has used it for twenty years and the public has paid for its maintenance for that period." (footnote omitted)).

Section 509 codified "the common law of statutory dedication and modif[ied] the common law with respect to private dedication." *Scureman*, 626 A.2d at 18. Thus, if a road "is a 'public road' or 'public highway' under common law principles of statutory dedication, then it is also a 'common highway' under § 509." *Id.* By contrast, Section 509 modified the "common law to protect the rights of private owners of roads who do not

58

object to public use of their roads but who had no intent to dedicate them to the public."[13]

This case does not involve a private dedication, so Section 509 applies as a codification of the common law.

A party must prove by a preponderance of the evidence that the contested road is public. *See id.* at 914 (finding that the plaintiffs "failed to establish by the preponderance of the evidence that [the] defendants' lot is traversed by a public road"). The Company argues that the Disputed Roads are "public" because the City of Wilmington either (i) laid them out as public roads pursuant to its authority or (ii) allowed them to become public roads through twenty years of public use and maintenance. Dkt. 212 at 20.

The Company sought to establish a public dedication by proving that the City laid out the Disputed Roads as public roads. A public road is a road that the owner controls and

---

[13] *Id.* at 20. At common law, "public user for an extended period of time without more was deemed to be evidence of an intent to dedicate a private way to the public." *Lofland v. Truitt*, 260 A.2d 909, 913 (Del. Ch. 1969). This "harsh" treatment of private landowners led the General Assembly to statutorily modify the common law:

> So many neighborhood roads exist by the indulgence of land owners, that the common law was considered harsh in reference to forfeiting private land by indulgence, and the Legislature has required that such a road shall have not only been used, but maintained and kept up by the public for twenty years, to make it a public road against the owner of the land.

*Johnson v. Stayton*, 5 Del. (5 Harr.) 448, 450 (Del. 1854). By enacting the predecessor to Section 509, the General Assembly intended "to protect the rights of a complacent or indulgent landowner who does not object to public use of his road but who has no intent to dedicate such road to the public." *Lofland*, 260 A.2d at 913.

maintains for use by the general public.[14] To carry its burden, the Company needed to prove not only that the City built the Disputed Roads, but also that the City constructed them for public use.

It is undisputed that the City built the Disputed Roads. The City built the Port in 1922. JX 67 at '117. The evidence shows that by the 1930s at the latest, the City had built the Disputed Roads. *See* JX 116 (1931 map of the "Crane Hook Oil Storage Co. Plant and Approaches" depicting roads where the Disputed Roads are currently; 1931 aerial photograph showing road leading to the Tanks). The City had the authority to build the Disputed Roads under its charter. Hoffman Tr. 182; *see* 22 *Del. C.* § 802 (the "Home Rule," which empowers certain municipal corporations to "have and assume all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute;" the "powers" include constructing roads). GT does not contest this point.

The Company failed, however, to prove that the City established and maintained the Disputed Roads for use by the public. The Company contends that a 1923 map of the Terminal shows the City's plan for the roads and that the historical record indicates that

---

[14] *See Scureman*, 626 A.2d at 11 n.3 (quoting *Highway*, Black's Law Dictionary (5th ed. 1979)); *see also Public Highway*, Black's Law Dictionary (11th ed. 2019) ("A highway controlled and maintained by governmental authorities for general use."); *Common Highway*, Black's Law Dictionary, *supra*, ("A highway for use by the public for any purpose of transit or traffic.").

the City wanted to link the Port to the City. Dkt. 212 at 21; *see* JX 72 (the "1923 Map").[15] The 1923 Map does depict the Disputed Roads and shows them connecting to what are indisputably public roads. Hoffman, the Company's real estate expert, opined that this evidence shows that the City intended to "connect[] the Port to the City." Hoffman Tr. 183. That is a fair inference, but it does not follow that the City intended for the Disputed Roads to be public. The more reasonable inference is that the City wanted to connect the Port to the City, but at the same time wanted to be able to control access to the Port. It does not follow that the City wanted the roads within the Port to be public.

The Company also points to the naming of one of the Disputed Roads as "Sico Road," after SICO. The Company argues that the name evidences an intent to facilitate public access to the Tanks, originally owned by SICO. Dkt. 212 at 21. There are other more plausible inferences. One is that the name "Sico Road" recognized that SICO used the road in its terminalling business. Another is that the name adopted the road's destination—the SICO property—as a referent, like using "Philadelphia Pike" for a road that goes to Philadelphia or "Lancaster Pike" for a road that goes to Lancaster. The name "Sico Road" need not imply that the public could use the road to access the Tanks.

The Company therefore failed to carry its burden to prove that the City laid out the Disputed Roads as public roads. Alternatively, the Company argues that the Disputed

---

[15] The Company calls this the "1923 Map," and the court adopts that terminology. A notation on the map indicates that it was modified in the 1930s. *See* 1923 Map; Hoffman Tr. 323–24. Whether the map was from 1923 or from the 1930s does not materially alter the analysis.

Roads are public roads because they were publicly used and maintained for twenty years. Again, there is some evidence to support public use, but it is not enough to carry the Company's burden.

The Company argues that there was "unrestricted access" to the Tanks using the Disputed Roads beginning in the 1950s. Dkt. 212 at 7. The Company acknowledges that the unrestricted access ended in 1999 when a gate was placed across the entrance to the Port. *Id.* at 9 n.1; *see* JX 239 Ex. E. The Company introduced evidence to the effect that the members of the public frequently accessed the Port during the intervening period. *See, e.g.*, Klees Tr. 110–116; Matthews Tr. 620. But the Company's evidence does not prove that the public had an unrestricted right of access consistent with public use.

Instead, the Company's evidence suggests that the City and later the State gave permission to members of the public to access the Port. For example, Klees testified that while working at the Tanks, he could order pizza and have it delivered, that his parents occasionally stopped by to visit, and people with a historical interest in aspects of the Port occasionally would come view a memorial that was once there. Klees also recalled people being permitted to fish from locations in the Port and others who would go on board vessels to sell trinkets and other products. *See* Klees Tr. at 113–15.

But Klees acknowledged that the individuals accessing the Port interacted with a guard who asked them about their business and where they were going. *Id.* at 114. The presence of a guard is inconsistent with public use. To the extent there was some general public use, it appears to have been sporadic and limited.

The Company presented some evidence in support of an interesting theory. Nevertheless, the Company's showing is not sufficient to support a finding that the Disputed Roads are public roads.

### 3. The Argument For An Express Easement

The Company also asserted that it holds an express easement which allows it to traverse the Disputed Roads. To support the existence of an express easement, the Company relies on a 1973 resolution passed by the Wilmington City Council. JX 53 at '600 (the "1973 Resolution"). That document does not create an express easement.

### a. Governing Principles Of Law

"An easement is a non-possessory interest in real property, granted for a particular purpose, enforceable of right and not depend[e]nt for its continued existence on the will of the grantor." *Coker*, 2013 WL 1858098, at *3.[16] An express easement "may be contained within the language of a deed or in a separate document." *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *4 (Del. Ch. Nov. 5, 2004). A court may find that an express

---

[16] There are two types of express easements: easements appurtenant and easements in gross. "[A]n easement in gross is personal to the grantee, [and] as a general matter it dies with the grantee." *Id.* at *5. An appurtenant easement "form[s] a part of the propert[y] and run[s] with the land." *Id.* Because an appurtenant easement runs with the land, "it bind[s] successors-in-title." *Id.* The court need not determine whether the easement that the Company claims was appurtenant or in gross. The grantee of the easement was Energy Transporters, then an affiliate of the Delaware Terminal Company. In 1987, Energy Transporters merged with the Delaware Terminal Company. Hoffman Tr. 196–97. By operation of law, Delaware Terminal Company succeeded to the rights of Energy Transporters. 8 *Del. C.* § 259. The Company acquired the Delaware Terminal Company in 2005. Hoffman Tr. 175. The Company thus beneficially owns whatever easement was granted initially to Energy Transporters, if an easement was in fact granted.

easement exists if the writing "contain[s] plain and direct language evidencing the grantor's intent to create a right in the nature of the easement." *Black v. Staffieri*, 2014 WL 814122, at \*2 (Del. 2014) (TABLE) (cleaned up). "No specific words are required so long as the writing clearly reflects the grantor's intent to create an easement." *Id.*

"The construction of language creating an easement or the interpretation of an express easement is a question of law for the court." 28A C.J.S. *Easements* § 186, Westlaw (database updated Mar. 2022). Documents conveying an interest in land "are specialized forms of contract, and like other contracts are not subject to construction unless the language is ambiguous." *Jestice v. Buchanan*, 1999 WL 962591, at \*2 (Del. Ch. June 14, 1999). "If there is no reasonable doubt as to the meaning of the words, the [conveyance] is unambiguous and the Court's role is limited to an application of the meaning of the words." *Smith v. Smith*, 622 A.2d 642, 646 (Del. 1993).

If a document conveying an interest in land is ambiguous, Delaware courts "apply accepted standards of construction." *Id.* When faced with such an instrument, "the Court will look to evidence of the grantors' intent at the time of the instrument[']s[] execution." *Francis v. Macklin*, 1990 WL 100799, at \*2 (Del. Ch. July 19, 1990). The court will "read [the ambiguous instrument] in the light of the intent of the parties as determined by the facts and circumstances surrounding the transaction." *Rohner v. Niemann*, 380 A.2d 549, 552 (Del. 1977). That is, the court will look to extrinsic evidence.

The parties' actual practice weighs heavily in the interpretation of an ambiguous instrument. "It is a familiar rule that when the nature and extent of a granted right is ambiguous or doubtful under the terms of the grant, the exercise of the right by its holder,

64

acquiesced in by the grantor, establishes its extent." *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49, 53 (Del. 1952). For example, in *Bogia v. Kleiner*, this court considered "decades of conduct" in determining how to interpret an easement. 2019 WL 3761647, at *8 (Del. Ch. Aug. 8, 2019).

There is also a specific interpretative principle applicable to easements. As noted, a court will consider extrinsic evidence when determining the "intent of the parties" to an ambiguous deed. *Rohner*, 380 A.2d at 552. But if an interpretation is not contrary to the intent of the parties, then "[a]ny uncertainties must be resolved in favor of the grantees." *Bogia*, 2019 WL 3761647, at *8 (cleaned up); *Richard Paul*, 91 A.2d at 53 ("In construing [ambiguous] grants, ambiguous or doubtful words will be construed in favor of the grantee."). Put another way, "[w]here uncertainties appear in the grant [of a deed], they must be resolved in favor of the grantee as long as such a construction does not violate any apparent intention of the parties to the transaction." *Rohner*, 380 A.2d at 552.

### a. The 1973 Resolution

The Company relies on the 1973 Resolution, which was a resolution passed by the Wilmington City Council to authorize the Mayor and City Clerk to execute copies of a proposed agreement with Energy Transporters. The underlying agreement contemplated that Energy Transporters would install and maintain a pipeline for transporting oil on City property. JX 53 at '601 (the "Pipeline Agreement").

The Pipeline Agreement contained an express easement that granted Energy Transporters permission to install and maintain the pipeline on City property. That easement granted to Energy Transporters

65

the right to construct and maintain, at the sole cost and expense of [Energy Transporters], a pipeline for the transportation of oil, residual oil, petroleum and petroleum products in the bed of the Christiana Avenue from the Marine Terminal to a site to be designated by [Energy Transporters] on Commerce Street, in the rights-of-way of City on Cherry Island for Fourth Street and Twelfth Street, and across lands owned by City adjacent to the Sico Property near the Marine Terminal.

JX 53 at '601. The Company agrees that the easement in the Pipeline Agreement only granted Energy Transporters the right to construct and maintain a pipeline. It did not grant a right of access to the Port.

In the 1973 Resolution, the City Council approved the Pipeline Agreement. The 1973 Resolution stated:

> BE IT RESOLVED BY THE COUNCIL OF THE CITY OF WILMINGTON that the Agreement between the City of Wilmington, a municipal corporation of the State of Delaware, and Energy Transporters, Inc., a corporation of the State of Delaware, granting permission to place a pipeline for the transportation of oil, residual oil, petroleum and petroleum products, in the bed of Christiana Avenue, Fourth Street and Twelfth Street on Cherry Island, together with rights-of-way from the Sico Property across the lands of the City of Wilmington adjacent to the Sico property, a copy of which is attached hereto and made a part hereof, is hereby approved and the Mayor and City Clerk are hereby authorized and directed to execute as many copies of this Agreement as may be found necessary or desirable.

*Id.* at '600.

The Company argues that the 1973 Resolution created an easement that is broader than the easement in the Pipeline Agreement. That is not correct. The 1973 Resolution did not create an easement, and the differences in language do not suggest any intent to create broader rights than the Pipeline Agreement.

For starters, the 1973 Resolution did not create an easement. Recall that to create an easement, a document must "contain[] plain and direct language evidencing the grantor's

66

intent to create a right in the nature of the easement." *Black*, 2014 WL 814122, at *2 (cleaned up).

Shorn of resolving language, subordinate clauses, and modifiers, the 1973 Resolution consists of the following compound sentence: "The Agreement . . . is hereby approved and the Mayor and City Clerk are hereby authorized and directed to execute . . . copies." The 1973 Agreement does not contain any language granting an easement.

The only language in the 1973 Resolution that addresses property rights appears in an adjectival phrase that modifies the word "Agreement." The 1973 Resolution identifies the Agreement in question as the one

> between the City of Wilmington, a municipal corporation of the State of Delaware, and Energy Transporters, Inc., a corporation of the State of Delaware, granting permission to place a pipeline for the transportation of oil, residual oil, petroleum and petroleum products, in the bed of Christiana Avenue, Fourth Street and Twelfth Street on Cherry Island, together with rights-of-way from the Sico Property across the lands of the City of Wilmington adjacent to the Sico property, a copy of which is attached hereto and made a part hereof.

JX 53 at '600. That language does not create an easement. It simply describes which agreement is being authorized and approved.

The reference to property rights in this lengthy adjectival phrase is not a grant, and it therefore does not create an easement. The description of property rights is an attempt to summarize what the Agreement provides.

The Company argues that the 1973 Resolution represents the action of the City Council, and that is true. *See Key Props. Gp., LLC v. City of Milford*, 995 A.2d 147, 151 (Del. 2010) ("[A] resolution is documented in a particular form, which includes 'resolving

67

clauses'—each identifying specific action authorized by the voting body."). But the action of the City Council was to approve an agreement and authorize the Mayor and City Clerk to execute copies of it. The action the City Council took was not to grant an easement. It did not say, for example, "BE IT RESOLVED THAT THE COUNCIL OF THE CITY OF WILMINGTON grants permission to Energy Transporters, Inc."

The Company also argues that the 1973 Resolution contains a broader description of the rights granted to Energy Transporters than the Pipeline Agreement. There is a slight difference.

> The Pipeline Agreement grants Energy Transporters
>
> the right to construct and maintain . . . a pipeline . . . in the bed of the Christiana Avenue from the Marine Terminal to a site to be designated by [Energy Transporters] on Commerce Street, in the rights-of-way of City on Cherry Island for Fourth Street and Twelfth Street, and across lands owned by City adjacent to the Sico Property near the Marine Terminal.

JX 53 at '601. The Pipeline Agreement thus makes clear that the rights-of-way "across lands owned by City adjacent to the Sico Property near the Marine Terminal" are for purposes of constructing and maintaining a pipeline.

The 1973 Resolution attempts to summarize the grant in the Pipeline Agreement, but it changes the words slightly. The 1973 Resolution describes the Pipeline Agreement as granting Energy Transporters permission "to place a pipeline . . . in the bed of Christiana Avenue, Fourth Street and Twelfth Street on Cherry Island, together with rights-of-way from the Sico Property across the lands of the City of Wilmington adjacent to the Sico property." *Id.* at '600. The latter framing makes it seem like the agreement contained an open-ended grant of "rights-of-way from the Sico Property across the lands of the City of

68

Wilmington adjacent to the Sico property," rather than a grant of rights-of-way solely for purposes of constructing and maintaining a pipeline.

This slight difference is not enough to suggest that the 1973 Resolution granted a broad easement to Energy Transporters conferring "rights-of-way from the Sico Property across the lands of the City of Wilmington adjacent to the Sico property." Read properly as a resolution approving the Pipeline Agreement, the difference simply reflects a clerk's attempt to capture the substance of the Pipeline Agreement, while doing so imperfectly.

The 1973 Resolution does not create an easement. It therefore cannot provide the Company with any right to use the Disputed Roads.

### 4. The Argument For A Prescriptive Easement

The Company also argues that it has a prescriptive easement over the Disputed Roads. To prove a prescriptive easement, the Company "must show, by clear and convincing evidence, that they have used the [Disputed Roads] in a manner that is: (1) open and notorious, (2) exclusive (against the public at large), (3) continuous for an uninterrupted period of at least 20 years, and (4) hostile to the true owner's claim of right." *Tubbs v. E & E Flood Farms, L.P.*, 13 A.3d 759, 766 (Del. Ch. 2011) (footnote omitted). The Company did not prove by clear and convincing evidence that its use was hostile.

The Company's evidence satisfies the first three elements of the test. First, the Company's use of the Disputed Roads was open and notorious. "To be open and notorious, the use must be so open, visible, and apparent that it gives the owner of the servient tenement knowledge and full opportunity to assert his rights." *Anolick v. Holy Trinity Greek Orthodox Church, Inc.*, 787 A.2d 732, 741 (Del. Ch. 2001) (cleaned up). The

69

Company openly used the Disputed Roads, and GT and its predecessors were aware of this use. GT does not dispute this point.

Second, the Company's use was exclusive. "For purposes of an easement by prescription, the use must be exclusive 'as against the public at large,' but the true owner and the person acquiring the easement by prescription may both make use of the easement." *Brown*, 2003 WL 136181, at *5 n.20.

> [T]he user need be exclusive only in the sense that it must not depend for its enjoyment upon a similar right in others; it must be exclusive as against the public at large, but two or more persons may independently acquire an easement by prescription to use the same road or way, and the easement may be acquired in common with the true owner.

*Marta v. Trincia*, 22 A.2d 519, 520 (Del. Ch. 1941). As noted, the Company failed to prove that the Disputed Roads were public roads. A corollary of the Company's evidentiary failure is that, consistent with the Company's nearly continuous use of the Disputed Roads and the absence in the record of others' use of the Disputed Roads, the Company's use is exclusive as against the public at large.

The third element is also met. The Company has been using the Disputed Roads since at least 1973. The historical evidence suggests that SICO and other prior operators of the terminalling business have used the Disputed Roads since at least the 1930s. The Company has satisfied the twenty-year prescriptive period. GT also does not dispute this point.

The Company failed, however, to prove that its use was hostile. For purposes of a prescriptive easement, "[h]ostility is a term of art meaning that the use is adverse to the true owner's claim of right." *Tubbs*, 13 A.3d at 767. A use is not hostile if it is done with

70

permission by the true owner. *See* Restatement (Third) of Property (Servitudes), § 2.16 cmt. f (Am. L. Inst. 2000), Westlaw (database updated Mar. 2022) ("When a property owner gives permission to use property, the law implies that a license was intended . . . . Permissive uses do not give rise to prescriptive rights . . . ."); *see also* Jon W. Bruce & James W. Ely, Jr., *The Law of Easements & Licenses in Land* § 5:9, Westlaw (database updated Oct. 2021) ("Permissive use, no matter how long continued, cannot ripen into a prescriptive easement."). In addition, "[w]hen use of a servient estate is initially permissive, the use will confer a prescriptive right only if the user subsequently makes a direct assertion of a claim hostile to the owner." Bruce & Ely, *supra*, § 5:9.

The Company failed to prove that its use was hostile as to the owner of the Port. Instead, the evidence indicates that the Company and its predecessors have used the Disputed Roads with permission from the owners and operators of the Port. Beginning with SICO in the 1920s, the parties who have conducted the terminalling business have entered into leases with the Port. *See* JX 78. They have not asserted a hostile right of access against the Port. Because the initial use of the Disputed Roads appears to have been permissive, the Company or its predecessors would have had to make a direct assertion of a claim to an easement. Before this case, there is no evidence that the Company or its predecessors did that.

Because the Company failed to prove hostile use, the Company failed to prove by clear and convincing evidence that it possessed a prescriptive easement.

71

**5.      The Argument For An Easement By Estoppel**

The Company finally argues it should be granted an easement by estoppel. "[A]n easement by estoppel is created when (1) a promisor's representation that an easement exists has been communicated to a promisee; (2) the promisee believes the promisor's representation; and (3) the promisee acts in reliance upon the promisor's representation." *Hionis v. Shipp*, 2005 WL 1490455, at *4 (Del. Ch. June 16, 2005), *aff'd*, 903 A.2d 323 (Del. 2006) (TABLE). The Company bore the burden of proving by clear and convincing evidence that it had an easement by estoppel. *See Charcap*, 2017 WL 3268183, at *6 ("[B]ecause estoppel is an equitable doctrine that creates an exception to the statute of frauds, a party seeking to enforce a parol contract faces an enhanced evidentiary burden, and must demonstrate by clear and convincing evidence that such an exception is applicable." (cleaned up)). The Company failed to do so.

The Company does not argue that anyone ever made a representation that an easement existed. Instead, the Company argues that "Port operators over the past nearly 100 years have represented to [the Company] and its predecessors that an easement exists by building Sico Road, entering into continuous partnerships and agreements, and never blocking access." Dkt. 212 at 39. The Company has not provided authority that would support recognizing a *de facto* representation based on a party's conduct. Presumably there could be such a case, but the conduct would have to be more extensive than what the Company has identified.

The Company relies on the name of "Sico Road," but as this decision has explained, the name makes sense for multiple reasons, including because SICO used the road and

72

because it led to the SICO property. The name does not suggest that SICO benefited from an easement. The Company's other evidence demonstrates the existence of a longstanding business relationship between the Port's operators and the Company and its predecessors, but again that evidence does not suggest that an easement exists. It is more consistent with the Port's operators consenting to the Company's use of the Disputed Roads as part of the commercial relationship that the parties documented in a series of leases.

The Company provided authority supporting the idea that "there may be a duty to disclose the existence of an easement (or lack thereof) where 'the servient estate owner observes the claimant improving the servient estate.'" *See Charcap*, 2017 WL 3268183, at *9 (quoting Bruce & Ely, *supra*, § 6:1)). The Company and its predecessors plainly invested in and improved the Buckeye Properties, including by building the Tanks. They did so, however, in reliance on the rights that they secured under leases with the Port's operators, including the current Lease. The evidence does not support a finding that the Company or its predecessors relied on any type of representation from the owners or operators of the Port that could support an easement by estoppel.

## III. CONCLUSION

The Company proved that it does not owe the Terminal Usage Fees. The Company also proved that it has an implied contractual right to make reasonable use of the Disputed Roads to access the Tanks as part of its terminalling business. The Company failed to prove its other theories.

Within thirty days, the parties shall present an implementing order that has been agreed-upon as to form. If there are other issues that the court must address before entering

73

a final order, then the parties shall submit a joint letter identifying the issues and proposing

a process for resolving them.